**STATE of Minnesota, Respondent,**

v.

**Kim Thul OUK, Appellant.**

No. C7–93–576.

Supreme Court of Minnesota.

May 13, 1994.

John M. Stuart, State Public Defender, Susan J. Andrews, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Thomas Foley, Ramsey County Atty., and Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

## OPINION

TOMLJANOVICH, Justice.

Appellant Kim Thul Ouk seeks to reverse his convictions for two counts of first degree murder in violation of Minn.Stat. §§ 609.-185(3) and 609.05, and two counts of attempted first degree murder in violation of Minn. Stat. §§ 609.185(3), 609.17 and 609.05. Ouk, who was 15 years old at the time of the offenses, claims the trial court erred in refusing to suppress statements made by him during custodial interrogation. Ouk claims he did not voluntarily and intelligently waive his rights where he was not advised by interrogating officers that any statement he made could potentially be used against him in an adult criminal prosecution. Ouk additionally challenges the sufficiency of the evidence presented at trial and appeals the trial court's order imposing consecutive sentences for each of his convictions. We affirm.

On the evening of June 7, 1992, Ouk, and seven other Asian youths met at the Roosevelt Projects in St. Paul. They stole three cars and decided to rob a gas station. With Ouk were Xeng Vang (hereinafter X. Vang), Siphon Vang (hereinafter S. Vang), Yong Lee, Tou Moua, Fue Kong, Kong Xiong and Shoua Yang.[1] Ouk and the others drove in the stolen cars to West Seventh and Davern in the Highland Park section of St. Paul, where an Amoco and a Total Mart gas station are located across the street from one another. They decided to rob both stations.

The youths divided into two groups. One group, made up of Kong, Xiong, and Yang, robbed the Amoco gas station. Kong carried a .22–caliber handgun in the robbery of the Amoco, which he claimed to have gotten from Ouk. The other group, made up of Ouk, Lee, S. Vang, X. Vang, and Moua, robbed the Total Mart. The robberies took place around 1:15 a.m. on June 8.

During the robbery of the Total Mart, two clerks, John Petsch and Feliuai Faamamafa, and two customers, Read Sulik and David Baer, were shot. Petsch and Faamamafa died from their wounds. Sulik and Baer survived but required emergency medical treatment. All of the victims were shot at close range, and none of the victims offered any resistance. Petsch was shot in the left shoulder from less than an inch away. Faamamafa was shot in the back from a distance of two to four inches. Baer was shot in the back while lying face down on the floor. There was a pause between each shot. Some cash, food items, and cigarettes were stolen from the Total Mart.

Immediately following the robberies, a police investigation began. Around 2:15 a.m. on June 8 an automobile was stopped on the east side of St. Paul by Officer Michael Reuvers for turning without signaling. Reuvers observed that the ignition had been "punched."[2] Upon confirming that the car was stolen, Reuvers arrested its three occupants, S. Vang, Lee, and Moua. Screwdrivers, food items, cartons of cigarettes, and a Hudson street map opened to Highland Park were found in the car. The cigarettes carried Total Mart's identification number. One hundred sixty-six dollars in cash, including a two dollar bill identified as having been in the Total Mart cash register, were found on Lee when he was later searched. S. Vang, Lee and Moua were separated and taken to the police station for questioning. They each stated that Ouk carried the gun in the Total Mart Robbery.

A search warrant for Ouk's house was obtained, and 25 to 30 armed police officers surrounded the house. After two hours of negotiating over the phone, Ouk was persuaded to give himself up.[3] Ouk was told

---

1. Moua was the only adult in this group. The others ranged in age from 15 to 17. All of the group members except Ouk were of Hmong descent. Ouk is Cambodian, and immigrated to this country around 1981.

2. A "punched" ignition is an ignition which has had a hole punched in it and the car has been started with a device other than a key.

3. Most of the negotiating took place between officer David Yang, a member of the Asian Community Outreach Program, and defendant's brother, Kornthea Ouk.

during the negotiations that he was a suspect in a shooting and robbery. Upon leaving the house, a shirtless and highly agitated Ouk told police to shoot him. A gun cleaning kit and two pairs of wet tennis shoes were found in the house.

Ouk was interviewed by Sergeant Daniel Carlson of the juvenile unit in the homicide unit conference room. Officer Yang was also present. Before giving Ouk his Miranda rights and before asking Ouk any questions, Carlson waited for the results of a gun shot residue ("GSR") test which had been administered to Ouk.[4] Before the GSR results were available, Ouk asked Carlson why he was there. Carlson responded that he was investigating two robberies. Ouk then denied any involvement and claimed he had been at home the entire previous evening. Carlson responded that he would discuss this matter with Ouk after the GSR test was completed. Upon completion of the GSR test, Carlson read Ouk his rights from the same form used for adult suspects. Ouk indicated he understood his rights.[5]

After being informed of his Miranda rights but before being asked any questions, Ouk admitted having been in the store and having stolen cigarettes.[6] In response to specific questions, Ouk denied having had a gun or having shot anyone, and said he could not remember the names of the people he was with nor the brand of cigarettes he had taken. Ouk stated that he walked home from the Total Mart with X. Vang because the car they drove to the Total Mart would not start. When asked a second time whether he had shot anyone, Ouk asked for a lawyer, and the interview ended.

Carlson interviewed X. Vang several times, and as a result of these interviews, X. Vang agreed to show Carlson where in Highland Park the murder weapon (a .38–semiautomatic handgun) was located as well as shirts X. Vang and Ouk had been wearing that evening. With X. Vang's help, on June 9th, Carlson retrieved a .38 semiautomatic, a gun clip, some cigarette cartons belonging to Total Mart, and three shirts.

On July 22, 1992, Ouk was indicted by a grand jury on two counts of first degree murder in violation of Minn.Stat. §§ 609.-185(3) and 609.05, and two counts of attempted first degree murder in violation of Minn. Stat. §§ 609.185(3), 609.17 and 609.05. On July 23, 1992, a juvenile court judge issued an order for reference for prosecution as an adult. At the omnibus hearing, Ouk sought to exclude items seized from his house and his statements to police on the grounds that there was not probable cause to search his house or arrest him and that he did not give

---

**4.** A GSR test is used to determine if a hand has been near a firearm when a firearm has been discharged. Ouk's GSR test was inconclusive.

**5.** This portion of the conversation was tape recorded, and the following is a transcript:

CARLSON: This is the Miranda form PM 247.1, and the time of the interview is beginning at 2:43 p.m., on 6/8/92, and the individual we're talking to, his first name is Kim Thul, his last name is Ouk, O–U–K. His date of birth is 4/11/77. We'll be going over the Miranda form with him at this time. When I go over this with you, if you understand, if you would initial here as I read along, okay? (No audible response.) You have the rights to protection against self-incrimination listed below. Please read along with the officer and initial each statement if you understand it. Number 1: you have the right to remain silent and refuse at any time to answer any questions asked by a police officer. Do you understand that?
OUK: Yeah.
CARLSON: Okay. Thank you. Anything you do or say can be used against you. Do you understand that?
OUK: Yeah.

CARLSON: You have the right to talk to a lawyer and to have the lawyer with you during the questioning. Do you understand that?
OUK: Yeah.
CARLSON: If you cannot afford a lawyer, one will be appointed for you and you may remain silent until you've talked to him. Do you understand that?
OUK: Yeah.
CARLSON: Okay. The above statements have been read to me. I have initialed each paragraph to show that I understand each of my rights. Do you understand that sir?
OUK: Yeah.
CARLSON: Would you sign down there please. Okay. I will also sign on there: Sergeant Carlson, with the St. Paul Police Department, Juvenile Unit.

**6.** It is unclear from the record whether Ouk specified that he had been in the Total Mart at this time, or whether this became clear upon further questioning.

a valid waiver of his Miranda rights. District Court Judge George O. Peterson rejected Ouk's constitutional claims. Peterson held that Ouk's statements prior to Miranda warnings being given were fully voluntary, and that Ouk's statements after Miranda warnings had been given were pursuant to a knowing, understanding and voluntary waiver of rights.

At trial the prosecution's case centered on Ouk's own statements and the testimony of five of Ouk's accomplices. Neither of the two surviving victims, Sulik and Baer, could identify Ouk as being present at the robbery or as the shooter. The accomplices who testified were Lee, S. Vang, and X. Vang (Total Mart robbers), and Xiong and Kong (Amoco robbers).

Lee testified as follows. X. Vang remained outside the Total Mart while Lee, Ouk, S. Vang and Moua entered. Ouk carried the gun. While in the Total Mart, S. Vang grabbed donuts, Moua grabbed cigarettes, and Lee took money from the cash register. As Lee ran out the door he looked back through the window and saw Ouk behind the counter pointing the gun towards the ground. As he ran away, he heard two shots. Lee, S. Vang and Moua then drove off in one of the stolen cars while X. Vang waited for Ouk.

X. Vang testified that he chose not to enter the Total Mart, but while waiting outside heard shots. X. Vang further testified that he waited for Ouk, who was the last person to leave the store, while Lee, S. Vang and Moua drove off in one car. When Ouk returned, Ouk was carrying a gun. Ouk told X. Vang that he "had shot them all." Ouk and X. Vang tried to leave in one of the stolen cars, but when the stolen car would not start, they left on foot. On their way to Ouk's residence, Ouk threw the gun and the shirts Ouk and X. Vang had been wearing away. While climbing a fence, Ouk dropped the gun clip.

S. Vang testified at trial that Ouk participated in the robbery. Vang also testified that he did not see anyone in the store with a gun. This testimony, however, contradicted earlier statements that Ouk had carried the gun, which S. Vang had given at his guilty plea and at his initial interview with Carlson.

Xiong, who went into the Amoco, testified that it was planned prior to the robberies that two guns would be used: a .38 pistol to be carried by Ouk, and a .22 to be carried by Kong. Ouk provided Kong with the gun Kong used.

Kong, who went into the Amoco, admitted to carrying a .22 into the Amoco. He said that this gun was provided by a friend who gave the gun to him at Ouk's direction.

Testifying in his own defense, Ouk admitted going into the Total Mart and taking cigarettes, but denied shooting anyone. Ouk stated that he did have possession of two guns earlier in the evening which X. Vang gave him to hold. Ouk stated that he gave one of these guns to X. Vang and one to Kong. X. Vang then carried the gun into the Total Mart. Ouk recalled walking back with X. Vang to his residence, but did not recall anyone dumping a gun or a clip along the way. Ouk stated his belief that the others blamed the shooting on him because he was the only Cambodian in the group.

The jury convicted Ouk as charged. Ouk received two life sentences for his first degree murder convictions and two 180–month sentences for his two attempted first degree murder convictions. The trial court ordered that these sentences be served consecutively.

### I.

Defendant Ouk alleges that he did not validly waive his Miranda rights during custodial interrogation and that the trial court erred in failing to suppress his statements therein.

Before the state can introduce a defendant's incriminating statements made during custodial interrogation, it must show that the defendant knowingly, voluntarily, and intelligently waived his rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We have held that the determination whether a waiver of rights is voluntarily and intelligently made by a juvenile is a fact question dependent upon the totality of the circumstances. *State v. Hogan*, 297 Minn. 430, 440, 212 N.W.2d 664, 671

(1973). Factors to be considered in this test include the child's age, maturity, intelligence, education, experience, and the presence or absence of parents. On appeal, this court makes an independent determination, on the basis of the facts as found, whether a waiver was knowing, voluntary and intelligent. *State v. Linder,* 268 N.W.2d 734, 735 (Minn. 1978).

■ In this case there is no reason to believe that the 15–year–old Ouk was not of suitable intelligence and maturity to understand and validly waive his Miranda rights. *See Hogan,* 297 Minn. at 441, 212 N.W.2d at 671 (finding 15–year–old to be of suitable intelligence and maturity to understand rights). Ouk was familiar with his Miranda rights at the time of his interrogation, having already been advised of his rights on at least three prior occasions. Furthermore, Ouk knew how to exercise these rights—upon being asked whether he had shot anyone, Ouk asked for an attorney, and the interrogation terminated.

Ouk argues that his waiver of rights was nonetheless invalid because the interrogating officer failed to advise him that any statement he made could potentially be used against him in an adult criminal prosecution. We have recognized that juvenile confessions must be carefully scrutinized to ensure that the confidential atmosphere of the juvenile court does not encourage a confession by a juvenile which might otherwise be withheld. *State v. Loyd,* 297 Minn. 442, 445, 212 N.W.2d 671, 674 (1973). In *Loyd* we suggested the safest method was for the interrogating officers to advise juveniles that adult criminal prosecution could result in order to protect juveniles from unknowing and unintelligent waivers of their constitutional rights, but we held that the failure to so advise does not necessarily invalidate an otherwise valid waiver of rights. *Loyd,* 297 Minn. at 449–52, 212 N.W.2d at 677–78.

Under *Loyd* a juvenile waiver may be deemed valid provided that awareness of potential criminal responsibility may be imputed to the interrogated juvenile. *Loyd,* 297 Minn. at 450, 212 N.W.2d at 677. Awareness of potential criminal responsibility may be imputed to defendant Ouk. Ouk's residence was surrounded by 25 to 30 armed police officers prior to his arrest. Ouk was persuaded to give himself up after two hours of negotiating during which Ouk was told he was a suspect in a shooting and robbery. Ouk was then handcuffed and taken directly to the police station where he was interrogated in a homicide unit conference room. It was foreseeable from the nature of his arrest and from the nature of the crime (four victims shot at point blank range) that this matter would not be disposed of in the juvenile court system.

■ Ouk urges this court to overrule our holding in *Loyd* and to adopt a *per se* exclusionary rule which would bar the use of a juvenile's confession in a criminal prosecution for a felony where the juvenile is not warned about the possibility of adult prosecution. *See State v. Benoit,* 126 N.H. 6, 490 A.2d 295 (1985) (requiring juveniles to be advised of possibility of being tried as adult). While we adhere to our holding in *Loyd,* we again strongly encourage law enforcement officers to advise juveniles about the possibility of criminal prosecution as an adult whenever such prosecution is possible in order to protect juveniles from unknowing and unintelligent waivers of their constitutional rights.[7]

Ouk additionally argues that his waiver was invalid because the Miranda warnings issued by the interrogating officer were defective. Ouk was told that "anything you do or say can be used against you," instead of being given the standard warning which advises that "any statements made can and will be used against you in a court of law." The United States Supreme Court has held that warnings need not take a rigid form so long as they are correct in substance. *California v. Prysock,* 453 U.S. 355, 359–61, 101 S.Ct. 2806, 2809–10, 69 L.Ed.2d 696 (1981). We conclude that the warning given to Ouk was sufficient, but we remind interrogating officers that cryptic or paraphrased Miranda warnings may be deemed inadequate by a

---

7. In light of evidence that juvenile suspects are routinely not being informed of the possibility of adult prosecution, the Rules of Juvenile Procedure Committee may wish to consider whether to recommend to this court an exclusionary rule like that proposed by defendant.

reviewing court. *State v. Crisler*, 438 N.W.2d 670 (1989).

Because Ouk knowingly and intelligently waived his rights during custodial interrogation, the trial court properly admitted all of Ouk's statements.

## II.

Ouk next claims the evidence presented at trial was legally insufficient to convict him. Evidence of guilt is sufficient if, based on the facts contained in the record and the inferences that may legitimately be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978).

■ It is undisputed that during the commission of the armed robbery of the Total Mart four individuals were shot at close range in parts of their body where death was reasonably foreseeable. Two of the four victims died. At trial, five of Ouk's accomplices, Lee, X. Vang, S. Vang, Xiong, and Kong implicated Ouk as a participant in the Total Mart armed robbery. Lee testified that Ouk was in possession of the gun in the Total Mart. X. Vang testified that Ouk was in possession of a gun when he left the Total Mart, and testified that Ouk confessed to him that he "shot them all." Xiong, who helped rob the Amoco, testified that the plan was for Ouk to carry the gun during the robberies. Kong, who carried the .22 in the Amoco robbery, testified that the .22 was provided to him at Ouk's direction.

Under Minn.Stat. § 634.04 (1992) accomplice testimony must be corroborated by independent evidence. The testimony of one accomplice cannot corroborate that of another. *State v. Armstrong*, 257 Minn. 295, 308, 101 N.W.2d 398, 407 (1960). Here, the accomplice testimony of Lee, X. Vang, S. Vang, Xiong, and Kong is corroborated by Ouk's own testimony that he participated in the robbery of the Total Mart and his testimony that he was in possession of guns to be used in the robbery prior to it.

The evidence presented at trial was sufficient to support the jury's verdict. Based on the evidence presented, the jury could rea-sonably conclude not only that Ouk participated in the armed robbery of the Total Mart, but that Ouk was the gunman who shot each of the victims.

## III.

■ The remaining issue is whether the trial court erred in imposing consecutive sentences. The decision to impose concurrent or consecutive sentences, including consecutive life sentences, falls within the discretion of the trial court. Minn.Stat. § 609.15 (1992); *State v. Brom*, 463 N.W.2d 758, 765 (Minn.1990), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991). When reviewing imposition of consecutive life sentences, this court considers whether consecutive sentences are "commensurate with culpability and not an exaggeration of defendant's criminality." *Bangert v. State*, 282 N.W.2d 540, 547 (Minn.1979). This court is guided by past sentences received by other offenders. *State v. Miller*, 488 N.W.2d 235, 241 (Minn.1992).

■ The evidence supports a conclusion that Ouk methodically shot each of four victims at close range in parts of their body where death was a foreseeable result, with none of the victims offering any resistance. It is a mere fortuity that two victims survived. Under these circumstances, the trial court's imposition of consecutive sentences is commensurate with culpability and does not exaggerate defendant's criminality. *See State v. Lee*, 491 N.W.2d 895, 902 (Minn. 1992) (affirming consecutive life sentences where appellant killed one victim with a knife and attempted to kill two others); *Brom*, 463 N.W.2d at 765 (affirming consecutive life terms where appellant murdered his parents and siblings in their home with an axe); *Bangert*, 282 N.W.2d at 547 (affirming consecutive life sentences where appellant shot and killed two victims while they slept).

Affirmed.