STATE of Minnesota, Respondent,

v.

Calvin Nivlac JONES, III, Appellant.

No. C9–96–1162.

Supreme Court of Minnesota.

July 10, 1997.

318

John M. Stuart, Minnesota State Park Public Defender, Lyonel Norns, Minneapolis, for Appellant.

Hubert H. Humphrey, Attorney General, John B. Galus, St. Paul, James Reuter, Chisago County Attorney, Center City, for Respondent.

## OPINION

TOMLJANOVICH, Justice.

A Washington County jury convicted Calvin Nivlac Jones, III, a juvenile, of first-degree murder in connection with the shooting death of Richard Doyle. The state based a large portion of its case on two separate statements given by Jones to police. In the first statement, Jones admitted he was the one who pulled the trigger. In the second statement, Jones stated he pulled the trigger only after his cohort, Darrell Johnson, first pointed the gun at and threatened to kill him. Jones now contends that the trial court erred in admitting both statements because the police, prior to receiving the statements, failed to allow him to speak with his mother and failed to advise him of the possibilities of adult sanctions. We hold that the trial court did not err in admitting the statements, and as such, affirm the conviction.

## I.

The conviction in this case arises from the December 6, 1994, shooting death of Doyle at Tim's Country Cupboard, a convenience store located near Interstate 35 in Stacy, Minnesota. Two witnesses saw two men outside Tim's Country Cupboard at approximately 10 p.m. on December 6, 1994. The first witness saw one of the men standing at the gas pump. Approximately 15 minutes later, the second witness noticed a dark-colored automobile pull up to the side of the store. As the witness left the store after making a purchase, he noticed the same automobile idling by the store with its running lights on. At approximately 10:30 p.m., a third witness arrived at the store. As he pulled up, he saw two men putting something into the back seat of a dark-colored Pontiac. The two men then drove off at a high speed. This witness entered the store where he saw an open cash register and Doyle lying on the floor nearby with a pool of blood around his head. The witness dialed 911 and reported what he saw.

Chisago County Deputy Chris Henricks arrived at the scene a short while later and the witness described to him the dark vehicle and the men he had seen. Henricks then radioed the information to other law enforcement officers in the area. On the chance that the vehicle seen leaving the store would be fleeing south on Interstate 35, Chisago County Deputies Russell Frank and Gene Hill proceeded in separate squad cars to the Interstate 35 Wyoming exit. A short while later, Frank observed a late model Pontiac Grand Am traveling south on the interstate. Frank immediately pulled into traffic behind the vehicle. The Grand Am then left the interstate at the Wyoming exit, accelerated, ran a stop sign at the top of the exit ramp and turned west on County Road 22. Hill, who was positioned on County Road 22, turned on his siren and gave chase. Frank followed, and an additional six to eight law enforcement vehicles soon joined the pursuit.

### A. Arrest and subsequent statements

The chase covered approximately 22 miles at speeds of up to 130 miles per hour. It ended when the suspect vehicle unsuccessfully attempted a left-hand turn at high speed, left the roadway, hit a utility pole and came to rest in a field. A number of officers drew their weapons and approached the vehicle. Jones, who was in the passenger seat, and Darrell Johnson, who was driving, both surrendered.[1]

#### 1. December 6, 1994, statements

While being led in handcuffs to Frank's squad car, Jones asked if he would be in trouble because "the other guy shot the guy at the store." Frank said, "What?" and Jones repeated his statement. Frank then told Jones there could be no further conversation between the two of them. Once seated in the squad car, the suspect identified himself as Calvin Nivlac Jones, III. He also told Frank he was 17 years old. At approximately 11:22 p.m., Frank returned to the squad car and read Jones his *Miranda* rights. Jones indicated that he understood his rights and was willing to speak with Frank. Frank did not, however, tape-record the subsequent interrogation. During this interrogation, Jones made numerous statements about his relationship to the other suspect, including the fact that Johnson had disposed of the gun during the high-speed chase. Jones also described the gun and its location.[2] Jones subsequently claimed he was dizzy and tired and that he had hit his head in the car accident. Frank summoned paramedics, who examined Jones but discovered no injuries. During the transport to Chisago County Jail, Frank stopped at a gas station in Wyoming, Minnesota, where he discussed with Jones the location of the weapon alleged to have been used in the crime.

At the omnibus hearing, Jones did not contest the admissibility of the spontaneous statement he made upon his arrest, nor the admissibility of statements he made regarding his age and identity while in the back seat of Frank's squad car. He did, however, contest the admissibility of the remainder of the statements he made while in the back seat of Frank's squad car. The trial court granted Jones' motion to suppress all statements made in response to Frank's custodial interrogation on the grounds that the police failed to record the interrogation. *See State v. Scales*, 518 N.W.2d 587 (Minn.1994).

#### 2. December 7, 1994, statements

At approximately 1:40 a.m. on December 7, 1994, police took Jones to an interview room where he was interrogated by Bureau of Criminal Apprehension (BCA) agents Eugene Leatherman and John Hermann. Agent Hermann advised Jones of his *Miranda* rights, and Jones indicated he understood those rights and agreed to give a statement. Despite being aware that Jones was 17 1/2 years old, the agents did not ask Jones if he would like to speak to one of his parents or another responsible adult, and Jones did not request to speak to his mother until the conclusion of the interrogation at approximately 2:59 a.m.

During the interrogation, Jones told the agents that he and Johnson had gone to the casino in Hinckley, Minnesota, on December 6, 1994. Jones also said that Johnson was angry about losing a considerable amount of money at the casino. Jones said Johnson turned off Interstate 35 at the Stacy exit to purchase gas and get something to eat. According to this version of the facts, Jones

---

1. Police investigators found $607 in the form of crumpled bills in the Grand Am. Police also recovered a quantity of Minnesota State Lottery tickets and four packages of Kool cigarettes. Approximately $600 and a quantity of Minnesota State Lottery tickets were later found missing from Tim's Country Cupboard. The lottery tickets were later identified as having come from Tim's Country Cupboard, and the cigarette packs bore the tax-identification number of the convenience store's wholesale supplier.

2. On December 8, 1994, law enforcement agents conducted a search along the route of the high speed chase and found a .22 caliber pistol in a driveway on the north side of County Road 22. The ditch was adjacent to the passenger side of a car as it traveled westbound. The pistol's owner, whom Johnson had been living with, later identified the pistol as hers. An expert determined that the bullet removed from the victim was consistent with those fired from the .22 caliber pistol recovered during the search.

said Johnson pulled the car into Tim's Country Cupboard. Jones said he fueled the car and both men eventually went inside. Jones said he then went to the back of the store to get some soft drinks. After returning to the counter area, Jones stated that he had turned away from the counter to get some chips when he heard a bang. Jones hesitated, turned and saw Johnson exiting the store. He then looked behind the counter and saw the clerk lying on the ground. Jones followed Johnson to the car where Johnson told Jones he had replenished his lost money. Jones then described the flight from the store and his subsequent apprehension. He also told the agents that Johnson had thrown the gun from the car during the chase.

When Agent Leatherman told Jones that there were surveillance cameras in the store and that there would be a videotape of the crime, Jones changed his story. He stated that he had shot the clerk at the direction of Johnson. Jones then stated that Johnson gave him the gun in the parking lot and told Jones to stand behind him when they walked into the store. Jones said that once they arrived at the counter, Johnson stepped out of the way and instructed Jones to shoot the clerk. Police concluded the interrogation at 2:59 a.m. At approximately 4 a.m., police became aware that there had been no videotape inside the VCR connected to the surveillance equipment inside Tim's Country Cupboard.

The trial court admitted these statements over Jones' objections, concluding that Jones had knowingly, voluntarily and intelligently waived his rights to remain silent and consult an attorney.

### 3. December 8, 1994, statement

On the evening of December 7, 1994, Jones requested to speak with authorities to provide additional information about the incident. Deputy Todd Rivard arranged to interview Jones at the Chisago County Sheriff's Office on December 8, 1994. At the inception of the interrogation, Rivard again advised Jones of his *Miranda* rights and Jones said he would talk. At the outset of the interrogation, Jones asked if the police had recovered the surveillance videotape and

Rivard said, "yeah cause then we'll see exactly what happened." Rivard then said the authorities had not yet received the videotape because of a mixup at the store. Despite his awareness that Jones' mother was in the building, Rivard did not ask Jones if he would like to speak with his mother. Jones did not ask to speak with his mother until the conclusion of the interrogation. During this interrogation, Jones added to his prior version of events by claiming that Johnson had pointed the gun at him before they entered the store and threatened to kill him if he did not agree to shoot the clerk.

The trial court admitted these statements over Jones' objections, concluding that Jones had knowingly, voluntarily and intelligently waived his rights to remain silent and consult an attorney.

### 4. December 13, 1994, statement

On December 13, 1994, Jones once again asked to speak with police regarding the incident. Jones at this point had retained counsel and, prior to any further interview, Deputy Ronald Butcher left a voice-mail message with the attorney. After not hearing from the attorney for approximately five minutes, Butcher proceeded with the interview and read Jones his *Miranda* rights. Five minutes later, Jones' counsel telephoned Butcher and requested that the deputy suspend the interrogation until the attorney could attend. Butcher complied with this request and recommenced the interview when the attorney arrived 45 minutes later. Jones added to his prior statements by claiming that Johnson also had been armed with a .25 caliber pistol, and that Johnson pointed the second weapon at Jones during the robbery.

Shortly thereafter, Chisago County authorities organized and carried out a search for a second gun, but could not find one. After the snow had melted in April of 1995, authorities conducted another search for a second gun, but, once again, found no second gun. Jones later admitted that he fabricated the portion of the story relating to a second gun.

The trial court admitted these statements over Jones' objection, and Jones does not appeal that ruling.

### B. Trial

A grand jury on February 10, 1995, indicted Jones for murder in the first degree, murder in the second degree, aggravated robbery, theft over $500, aiding and abetting the theft of a motor vehicle,[3] and aiding and abetting the fleeing of a police officer. After a change of venue to Washington County, Jones was tried by a jury.

Jones testified at trial on his own behalf, where he reiterated his original story that Johnson had shot Doyle while Jones was in another part of the store. Jones attempted to explain his subsequent admissions that he shot the clerk by testifying that he was afraid he might suffer retribution if he were to "snitch" on Johnson. Jones went on to explain that his belief that the surveillance videotape existed—a belief based on the BCA agents' statements—was the reason he told police he shot the clerk. Because he believed the videotape eventually would exonerate him, Jones explained that he could save himself "a world of hurt and tell them something totally different and let them see for themselves. * * * Because that way I ain't got to put myself in a situation where I would get myself hurt rather than I can avoid it all, tell them some bullshit story and let it be."

The jury found Jones guilty of all charges, and the trial court sentenced him to life imprisonment.

### II.

Jones argues that we should use our supervisory powers to require police to provide two specific protections prior to making any requests for information from juveniles who are under arrest. First, Jones asks that we require police to tell juveniles who ultimately are tried as adults that they are likely to be tried as adults. Second, Jones asks that we should require police to provide juveniles access to a parent or other responsible adult.

Before considering the validity of each of these requests, however, it is important that we first define the rights such requirements are intended to protect.

The Fifth Amendment prohibits the federal government from compelling a person to testify against him or herself. U.S. Const. amend. V. Likewise, the Due Process Clause of the Fourteenth Amendment prohibits state governments from compelling a person to testify against him or herself. U.S. Const. amend. XIV; *see Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 519–20, 93 L.Ed.2d 473 (1986). A person can waive this protection and choose to incriminate him or herself only if such a waiver is knowing, intelligent and voluntary. *Connelly*, 479 at 163–67, 107 S.Ct. at 519–22; *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *State v. Merrill*, 274 N.W.2d 99, 106 (Minn.1978). Once a person is in police custody, this waiver can be knowing, intelligent and voluntary only after police inform the person of his or her rights to remain silent and consult an attorney. *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630–31. Should a person unequivocally indicate that he or she wishes to remain silent or consult an attorney, any statement obtained thereafter is per se inadmissible, that is, the actual voluntariness of the statement is irrelevant to the determination of its admissibility. *See id.* at 473–74, 86 S.Ct. at 1627–28. If police fully advise an accused of his or her *Miranda* rights and the accused indicates that he or she understands the rights but nevertheless gives an incriminating statement, the state is deemed to have met its burden of proving that the accused *knowingly* and *intelligently* waived his or her rights. *State v. Williams*, 535 N.W.2d 277, 286 (Minn.1995). In determining whether a juvenile has *voluntarily* waived his or her right to remain silent, however, a court must further evaluate the totality of the circumstances. *State v. Ouk*, 516 N.W.2d 180, 184 (Minn.1994). Factors to be considered under the totality-of-the-circumstances test include the juvenile's age, maturity, intelli-

---

**3.** The black Grand Am had been stolen from a residence in Shoreview, Minnesota, on December 5, 1994.

gence, education and prior criminal experience, as well as any physical deprivations during the interrogation, the presence or absence of parents, the length and legality of the detention, the lack of or adequacy of warnings, and the nature of the interrogation. *Williams,* 535 N.W.2d at 287.

■ The determination of a statement's admissibility does not end with a finding that the juvenile has knowingly, intelligently and voluntarily waived the right to remain silent, however. In addition, the court must determine whether the juvenile has voluntarily offered the inculpatory *statement. Williams,* 535 N.W.2d at 287 (stating that waiver of right to remain silent and the voluntariness of the actual confession are two separate issues). "The rule that a confession must be voluntary is designed to deter improper police interrogation." *Id.* In other words, a suspect can knowingly, intelligently and voluntarily waive his or her right to remain silent, but still can be coerced into making an inculpatory statement.

■ A defendant, therefore, can attack the admissibility of an inculpatory statement on three different grounds: (1) The defendant can claim that the statements are inadmissible because they occurred after the defendant invoked his or her rights under *Miranda;* (2) a defendant can claim that the statements are inadmissible because the defendant did not knowingly, intelligently and voluntarily waive his or her right to remain silent; and (3) the defendant can claim the statements are inadmissible because they were coerced, that is, the statements themselves were not given voluntarily. Although Jones did not clearly articulate the particular grounds upon which he bases his appeal, we will address each issue.

### III.

The United States Supreme Court established two procedural safeguards to protect the rights of an accused juvenile to be free from compelled self-incrimination during custodial interrogation. *Fare v. Michael C.,* 442 U.S. 707, 709, 99 S.Ct. 2560, 2563–64, 61 L.Ed.2d 197 (1979) (citing *Miranda,* 384 U.S. at 444–45, 473–74, 86 S.Ct. at 1612–13, 1627–28). Those procedural safeguards are the

right to remain silent and the right to an attorney. *Id.* "The Court specified, among other things, that if the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial." *Id.*

Despite *Fare*'s requirement that a defendant need indicate in "any manner" his or her desire to invoke either of the *Miranda* protections, the Supreme Court has held that police must cease an interrogation only after a defendant has *unambiguously* invoked his *Miranda* rights. *Davis v. United States,* 512 U.S. 452, 461–62, 114 S.Ct. 2350, 2356–57, 129 L.Ed.2d 362 (1994) (holding that police have no obligation to stop interrogation until defendant makes an unambiguous or unequivocal request for counsel); *Fare,* 442 U.S. at 723–24, 99 S.Ct. at 2570–71 (holding that juvenile's request to see probation officer invoked neither the right to counsel nor the right to remain silent); *Williams,* 535 N.W.2d at 285 (holding that invocation of right to remain silent must be unambiguous). In the case at bar, there is no evidence that Jones *unambiguously* invoked either of his *Miranda* rights prior to giving his statements on December 7 or December 8. In fact, the police read Jones his *Miranda* rights prior to each interview and in both cases Jones explicitly stated that he understood his rights and wished to speak with police.

There is a question, however, as to whether Jones' request to speak with his mother following the December 7 interrogation was, in essence, a request to invoke either his right to remain silent or his right to speak with an attorney. *See People v. Burton,* 6 Cal.3d 375, 383–84, 491 P.2d 793, 798, 99 Cal.Rptr. 1, 6 (1971) (holding that a minor's request to see his parents during custodial interrogation constituted an invocation of the minor's Fifth Amendment rights); *see also Fare,* 442 U.S. at 730, 99 S.Ct. at 2574 (Marshall, J., dissenting) (reiterating California Supreme Court's conclusion that "it is fatuous to assume that a minor in custody will be in a position to call an attorney for assistance"). The Supreme Court has not specifi-

cally ruled on the significance of a juvenile's request to speak with a *parent*. In *Fare*, however, the Supreme Court concluded that a juvenile's request for a *probation* officer was not an invocation of minor's right to remain silent or right to counsel. *Fare*, 442 U.S. at 721–24, 99 S.Ct. at 2570–71. The Court in *Fare* based its holding on the grounds that a probation officer does not afford a criminal defendant the same kind of protections as an attorney, and that "[i]t thus is doubtful that a general rule can be established that a juvenile, in every case, looks to his probation officer as a 'trusted guardian figure' rather than as an officer of the court system that imposes punishment." *Id.* at 721, 99 S.Ct. at 2570. Although the precise question was not before it, the Court stated that a juvenile's request for a parent should be only one of many factors used to determine the voluntariness of a waiver.

> Where the age and experience of a juvenile indicate that his request for his probation officer or *his parents* is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination.

*Id.* at 725, 99 S.Ct. at 2572 (emphasis added).

■ We likewise conclude that a juvenile's request to speak with a parent does not automatically invoke either the right to an attorney or the right to remain silent. Although such a request will remain one of the factors upon which courts must rely in ruling upon the validity of a juvenile's waiver, Jones' request in the case at bar does not meet the unambiguous standard required by

either *Fare* or *Williams*. As such, we hold that Jones did not at any time invoke either his right to counsel or his right to remain silent.

## IV.

Before the state can introduce a defendant's incriminating statements made during custodial interrogation, it must show that the defendant knowingly, intelligently and voluntarily waived his right to remain silent. *Ouk*, 516 N.W.2d at 184 (citing *Miranda*, 384 U.S. 436, 86 S.Ct. 1602). We have held that the determination whether a juvenile's waiver of his or her rights is knowing, intelligent and voluntary is a fact question dependent upon the totality of the circumstances. *State v. Hogan*, 297 Minn. 430, 440, 212 N.W.2d 664, 671 (1973). Factors to be considered in this test include the child's age, maturity, intelligence, education, experience, and the presence or absence of parents. *Ouk*, 516 N.W.2d at 185.

■ Under this test, we will not reverse the trial court's specific findings unless they are clearly erroneous, but we will make an independent determination, on the basis of the facts as found, of whether the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent and voluntary. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). It is undisputed that the factors relating to Jones' age,[4] education,[5] prior criminal history,[6] the presence or absence of any physical deprivations during interrogation,[7] the legality of the detention,[8] the adequacy of the warnings [9] and

---

4. Jones was born on May 31, 1977, consequently he was 17 1/2 years old on December 6, 1994.

5. Although Jones was not attending high school, he had completed the 11th grade. *See State v. Nunn*, 297 N.W.2d 752 (Minn.1980) (concluding that appellant's status as high-school student implied that he had experienced sufficient education, among other factors, to make a knowing, intelligent and voluntary waiver of his right to remain silent).

6. Jones had been adjudicated delinquent of ten felony-type offenses in the six years prior to his December 6, 1994, arrest.

7. The trial court found no indication that Jones' physical injury affected his ability to understand his rights. In addition, the trial court found no indication that physical fatigue affected Jones' ability to understand his rights or provide appropriate responses.

8. Although Jones argued at the omnibus hearing that his indictment should have been overturned, he never argued that the police lacked probable cause to arrest or keep him in custody.

9. The police gave Jones complete *Miranda* warnings before each of the interrogations at issue in this case.

the nature of the interrogation [10] all weighed in favor of the state's assertion that Jones' waiver was knowing, intelligent and voluntary. It is also undisputed that the failure to provide access to a parent or other responsible adult was the only factor clearly supporting Jones' argument that his waiver was not knowing, intelligent and voluntary.

There was a dispute, however, regarding the factual basis upon which the trial court based its determination that Jones had sufficient maturity and intelligence to understand his rights. Jones offered expert testimony that his IQ relating to abstract reasoning was in the range of mental retardation; that he was depressed; and that he was extremely susceptible to domination by persons whom he perceives to be in positions of authority. The state, on the other hand, offered expert testimony that Jones' intellect did not interfere with his ability to make decisions and exercise judgment and that Jones was not unduly susceptible to manipulation by authority figures. In addition, the state offered testimony by police officers that Jones was alert and his reaction to questions was direct, detailed, appropriate and responsive. In concluding that Jones had sufficient intelligence and maturity to knowingly, intelligently and voluntarily waive his right to silence, the trial court stated that it was not persuaded by the testimony of Jones' expert.

Under the clearly erroneous standard, we shall give due regard to the trial court's ability to ascertain the credibility of witnesses. Minn. R. Civ. P. 52.01; *In re Knops*, 536 N.W.2d 616, 620 (Minn.1995). We also note that the trial court's evaluation of credibility is of particular significance where the findings of fact rest almost entirely on expert testimony. *Knops*, 536 N.W.2d at 620 (citing *In re Joelson*, 385 N.W.2d 810, 811 (Minn.1986)). As such, we find that the trial court's decision to believe the state's witnesses was within its discretion and not clearly erroneous, and we therefore affirm the trial court's finding that Jones had sufficient maturity and intelligence to knowingly, intelligently and voluntarily waive his rights. In conclusion, therefore, we hold that the trial court did not err in finding that, under the totality-of-the-circumstances test, a defendant who, at the time of commission, was 17 1/2 years of age, had completed the 11th grade, had been adjudicated delinquent of ten felony-type offenses, had presented no evidence that he had suffered any physical deprivation during interrogation, had been arrested following a high-speed chase, had received *Miranda* warnings before each admitted statement, had been informed by his interrogators that they were working for the sheriff's office, and who had the sufficient maturity and intelligence to understand his rights, did in fact knowingly, intelligently and voluntarily waive his rights despite the fact that he was not given the opportunity to speak with a parent or other responsible adult.

## V.

Jones also asks us to overturn the totality-of-the-circumstances test and impose a pair of per se rules whereby a juvenile's waiver is invalid when the juvenile does not first speak to a parent or other responsible adult, or when the juvenile is not informed that he or she could face the possibility of adult sanctions. Both issues have been

---

**10.** Jones argues that even though he was arrested and interrogated by several investigators while in custody, it did not necessarily follow that adult sanction would follow. Jones misstates the law. As stated in *State v. Loyd,* 297 Minn. 442, 212 N.W.2d 671 (1973), the issue is not whether the appellant has been informed that adult sanctions may follow, it is whether the circumstances regarding the interrogation make it clear that the process is outside the realm of the juvenile court. *See Loyd,* 297 Minn. at 450, 212 N.W.2d at 677; *Ouk,* 516 N.W.2d at 185 (stating that "[i]t was foreseeable from the nature of his arrest and from the nature of the crime (four victims shot at point blank range) that this

matter would not be disposed of in the juvenile court system").

The circumstances surrounding the arrest in the case at bar (Jones was surrounded by a number of police cars following a high-speed chase, handcuffed and taken to a police station and advised that he was a suspect in a shooting and robbery) and interrogation (the police informed Jones they were working for the sheriff's office at the inception of the December 7 interrogation) make it clear that the trial court did not err in imputing to Jones the knowledge that he was not being treated in the juvenile justice system.

before us, and in each instance, we refused to adopt either proposed rule. *Hogan*, 297 Minn. at 440, 212 N.W.2d at 671 (rejecting absolute rule that every minor is incapable and incompetent as a matter of law to waive his or her constitutional rights); *Ouk*, 516 N.W.2d at 185 (rejecting absolute rule that would bar the use of a juvenile's confession in a criminal prosecution for a felony where the juvenile is not warned about the possibility of adult prosecution); *see also Nunn*, 297 N.W.2d at 755–56 (specifically rejecting both arguments). None of Jones' arguments persuade us to overrule those decisions, and, as such, we hold that courts must continue to utilize the totality-of-the-circumstances test in determining whether a juvenile's waiver of his or her right to remain silent is knowing, voluntary and intelligent.

### VI.

 Even when a defendant has knowingly, intelligently and voluntarily waived his or her right to remain silent, the state still must show the voluntariness of a confession by a preponderance of the evidence. *State v. Andrews*, 388 N.W.2d 723, 730 (Minn.1986). The test of voluntariness is whether the actions of the police, together with other circumstances surrounding the interrogation "were so coercive, so manipulative, so overpowering that [the defendant] was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did." *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991). The inquiry, like that involved in the determination of the legitimacy of a defendant's waiver of his or her right to remain silent, includes consideration of factors such as the defendant's age, maturity, intelligence, education, experience and ability to comprehend; the lack of or adequacy of warnings; the length and legality of detention; the nature of the interrogation; and whether the defendant was deprived of physical needs or denied access to friends. *Id.*

We previously have addressed many of those factors in determining the constitutional validity of Jones' waiver of his right to remain silent, and we decline to repeat ourselves here. *See Williams*, 535 N.W.2d at 287 (stating that analysis of the two issues significantly overlaps). But we do take this opportunity to address the circumstances regarding the nonexistent surveillance videotape. The record shows that police told Jones during the December 7 interrogation that surveillance cameras at the store had captured the entire event on videotape. The police testified at the omnibus hearing that at the time of making this statement they believed the cameras inside Tim's Country Cupboard indeed had captured the incident on videotape. According to police testimony, it was not until two hours after the conclusion of the December 7 interrogation that police became aware that no such videotape existed. Despite this information, police did not inform Jones during the December 8 interrogation that no videotape existed. In fact, Jones did not become aware of the nonexistence of a videotape until his attorney told him months later.

We have held that confessions extracted by the use of deceit and stress-inducing interrogation techniques are inadmissible. *State v. Garner*, 294 N.W.2d 725, 727 (Minn.1980). We also have stated, however, that the use of false information does not by itself render a confession inadmissible. *State v. Moorman*, 505 N.W.2d 593, 600 (Minn.1993). Instead, this court will ask whether the deceit is the kind that would make an innocent person confess. *See Williams*, 535 N.W.2d at 288. Only when the answer to this question is yes, will we conclude that the statement was given involuntarily.

 It is undisputed that, during the December 7 interrogation, police subjectively believed that the surveillance cameras inside the store had been operative and were going to produce a videotape. Consequently, police were not using trickery or deceit in stating as much. It also is undisputed, however, that prior to the December 8 interrogation, the police knew no such videotape existed, and despite requests from Jones about the whereabouts of the videotape, police refused to inform him that such a videotape did not exist. Although this certainly could be considered trickery, we hold that it was not the kind of deceit that would make an innocent person confess. *See Moorman*, 505 N.W.2d

at 600 (concluding that interrogating officer's misrepresentation concerning the existence of evidence was not sufficient to render confession involuntary).

## VII.

In conclusion, we hold that Jones did not invoke either his right to remain silent or his right to counsel by requesting to speak with his mother. In addition, we hold that under the totality of the circumstances, Jones knowingly, intelligently and voluntarily waived his right to remain silent, and that the police did not coerce Jones' inculpatory statement by failing to inform him that the surveillance cameras inside the store did not capture the alleged incident on videotape.

Affirmed.