**In the Matter of the WELFARE OF D.B.X.**

No. C4–01–792.

Court of Appeals of Minnesota.

Jan. 8, 2002.

450

Mike Hatch, Attorney General, St. Paul, MN; and Amy Klobuchar, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, MN, for respondent county.

John M. Stuart, State Public Defender, Peter W. Gorman, Assistant State Public Defender, Minneapolis, MN, for appellant D.B.X.

Considered and decided by SCHUMACHER, Presiding Judge, KLAPHAKE, Judge, and PETERSON, Judge.

## OPINION

KLAPHAKE, Judge.

D.B.X. was adjudicated delinquent for theft of a motor vehicle after he confessed to the crime during a police interrogation. He argues that he did not voluntarily waive his Miranda rights following the warning police gave him during his interrogation and that his later confession was not voluntary because he was subjected to a variety of coercive and improper police threats and promises. The district court concluded that the Miranda warning and waiver were adequate and that the confession was voluntary. We reverse.

## FACTS

In the early morning hours of September 28, 1999, three juveniles stole a 1988 Toyota Camry in Brooklyn Center, intending to drive it to Minneapolis. A witness observed the theft, and police later stopped the vehicle, but one of the juveniles, the driver, evaded police custody by jumping out of the vehicle while it was still moving. After obtaining statements from the two detained juveniles, Sergeant Kendal Chambers uncovered evidence that appellant D.B.X. was the juvenile who had escaped.

A month after the incident, on October 29, 1999, Olson Middle School's liaison officer removed D.B.X. from class. Without the knowledge or consent of his parents and without any explanation to him about his removal from school, D.B.X. was searched, handcuffed, and taken by squad car to the downtown command building in Minneapolis. Once there, he was escorted to an interrogation room and questioned for more than two hours by Sergeant Chambers. D.B.X. had no juvenile record and had never been detained or questioned by police.

A transcript of the interrogation[1] reveals that Chambers began by establishing an atmosphere of authority over D.B.X. He challenged the validity of D.B.X.'s last name and commented on his hairstyle. He also ordered D.B.X. to remove his shirt and checked under his other clothing to look for scars and tattoos and commented on those. When D.B.X. stated that one of his friends "[p]robably" went to Henry High School, Chambers admonished D.B.X. not to lie to him, indicating that D.B.X. should not use equivocal words. Chambers then asked questions to establish D.B.X.'s family living arrangement and expressed his disbelief about D.B.X.'s statements, which later proved to be accurate. Chambers said that if D.B.X. did not "come clean" on small matters, Chambers would not "be able to help." Chambers further elaborated, "I can't help you if you don't tell me the truth. Because I have to make a recommendation to the prosecuting attorney * * *." He then compared two kinds of people, non-remorseful criminals and people who "make a mistake," and indicated that he could only help the latter group.

At least 10 to 15 minutes into the interrogation, Chambers finally gave D.B.X. a paraphrased Miranda warning, as follows:

Q: * * * Have you ever seen anybody on TV have their rights read to them? Have you ever had your rights read to you before? Have you ever been arrested before?

A: Yes. But they never . . . [2]

---

1. Many portions of the interrogation are inaccurately transcribed. The statement of the facts here, including quoted portions of the interrogation, is based on our independent review of the interrogation tape.

2. Although D.B.X.'s answer to this compound question could be interpreted to mean that he had experience with police, at his Rasmussen hearing D.B.X. stated that he had never been arrested before. The record does not estab-

Q: They never read you your rights?

A: Yeah.

Q: This is just like on TV alright? You have the right to remain silent, do you understand that?

A: Yeah.

Q: Whew! Anything you say can and will be used against you in court. Do you undertand that?

A: Yeah.

Q: You have the right to talk to a lawyer and have a lawyer present now or anytime during questioning. Do you understand that?

A: Uh huh.

Q: Uh huh? Let me see your teeth. Oh, you've got good teeth. If you cannot afford a lawyer one will be appointed for you without cost. Do you understand that?

A: Yeah.

Q: All right * * * teeth. Do you feel comfortable talking to me?

A: Uh huh.

Thereafter, Chambers's questioning of D.B.X. intensified. Chambers suggested and repeated numerous times that it was in D.B.X.'s best interests to confess and that he could help D.B.X. He also set up a "rope of truth" which he wanted to throw to D.B.X., juxtaposing this image with the disclosure that he was about to submit the case to the prosecutor, that the truth would set D.B.X. free, and that he knew D.B.X. was not a hardened criminal. He referred to this rope of truth and the "quicksand" of deceit or deception several times during the interrogation. Throughout the interrogation, Chambers offered to act on D.B.X.'s behalf. He offered to talk to the prosecutor on several occasions and offered to go with D.B.X. on his court date to talk to the judge. Chambers also of-

lish that D.B.X. was ever arrested prior to this

fered to talk to D.B.X.'s family and explain to them that D.B.X. had merely made a mistake.

At one point Chambers stated, "I just want to get your statement to be able to tell the judge what kind of person you are." He pointed out that he would have to give the judge his opinion about the case and that the judge would have to decide on punishment, whether it would be "probation or * * * send him away to camp somewhere." He also stated that the owners of the stolen vehicle did not want him to go to jail.

Finally, in response to D.B.X.'s question, "Do I have to tell you how did we take the car?" Chambers responded affirmatively and stated that the interrogation would be done sooner if he told how they stole the vehicle and suggested that D.B.X. could leave after he confessed, stating: "Just tell me what happened. It's time. Let's get on with our lives. It's a weekend. It's Friday. You don't go to Saturday school do you?"

After hearing these statements, D.B.X. confessed to the theft of the car. The state filed a delinquency petition, and the district court held a contested evidentiary hearing. D.B.X. moved to suppress the interrogation tape, claiming that he did not voluntarily waive his Miranda rights and that his confession was coerced. When the district court denied his motion, the case was tried on stipulated facts, and D.B.X. was adjudicated delinquent based on the car theft. Following his disposition hearing, D.B.X. was placed on probation.

## ISSUES

1. Did the district court err in concluding that D.B.X. made a voluntary waiver of his Miranda rights?

incident.

2. Did the district court err in concluding that D.B.X.'s confession was voluntary?

## ANALYSIS

The Fifth and Fourteenth Amendments to the United States Constitution protect against self-incrimination and require that both a waiver of Miranda rights and a confession to a crime be voluntary. *State v. Scott,* 584 N.W.2d 412, 416–17 (Minn.1998); *see State v. Williams,* 535 N.W.2d 277, 284 (Minn.1995) (Miranda warning also designed to protect defendant's Sixth Amendment right to counsel). Constitutional protections may be waived if done so knowingly, intelligently, and voluntarily. *Scott,* 584 N.W.2d at 417. Whether a defendant has voluntarily waived the right to remain silent and voluntarily confessed to a crime are analyzed separately, but the factors a court must consider in determining these issues are the same. *Id.* "[T]he determination whether a juvenile's waiver of his or her rights is knowing, intelligent and voluntary is a fact question dependent upon the totality of the circumstances." *State v. Jones,* 566 N.W.2d 317, 324 (Minn.1997) (citation omitted). An appellate court will not reverse a district court's findings on the validity of a waiver unless the findings are clearly erroneous, but the appellate court

> will make an independent determination, on the basis of the facts as found, of whether the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent, and voluntary.

*Id.* (citation omitted). An appellate court "review[s] the voluntariness of a confession de novo as a question of law based on "all factual findings that are not clearly erroneous." *State v. Ritt,* 599 N.W.2d 802, 808 (Minn.1999), *cert. denied,* 528 U.S. 1165,

120 S.Ct. 1184, 145 L.Ed.2d 1090 (2000) (quoting *State v. Anderson,* 396 N.W.2d 564, 565 (Minn.1986)).

## I. Miranda Waiver

Typically, if police give a proper Miranda warning to an accused and the accused acknowledges his or her rights but makes an incriminating statement, the state has met its burden of proof to show that the waiver was knowing and intelligent. *Scott,* 584 N.W.2d at 417. In juvenile cases, however, the court must consider the totality of circumstances in determining whether the accused has voluntarily waived his or her right to remain silent. *Id.*

> Factors to be considered under the totality-of-the-circumstances test include the juvenile's age, maturity, intelligence, education and prior criminal experience, as well as any physical deprivations during the interrogation, the presence or absence of parents, the length and legality of the detention, the lack of or adequacy of warnings, and the nature of the interrogation.

*Jones,* 566 N.W.2d at 322–23 (citation omitted).

Here, while the length and legality of the detention and the lack of physical deprivations weigh in favor of the state, several other factors weigh strongly against a determination that D.B.X.'s Miranda waiver was knowing, intelligent, and voluntary. At age 14, D.B.X. had no juvenile record and had little or no prior contact with police. D.B.X.'s age and naiveté set him apart from the majority of juvenile Miranda cases involving the voluntariness of a Miranda waiver. The record does not firmly establish D.B.X.'s intelligence or maturity—his answers to questions were responsive, but typically minimal.[3] The

---

**3.** At his Rasmussen hearing, D.B.X. stated    that he did not understand the warnings, but

interrogation transcript reveals that he admitted, when asked by Chambers, that he did not understand certain English words, and his grammar and syntax are consistent with that of a person who speaks English as a second language.

Most troubling, however, is the failure of the police to involve D.B.X.'s parents before interrogating him, the inadequacy of the Miranda warning, and the nature of the interrogation. Sergeant Chambers never attempted to secure the presence of D.B.X.'s parents. During the interrogation, Chambers established that D.B.X. had lived with his maternal aunt and uncle from the time that he was very young. In referring to his birth mother, however, Chambers said, "I'm not gonna call her. Is that okay?" To this, D.B.X. replied, "Uh huh." While there is no absolute right to have parents present, the presence of parents is a factor that affects the voluntariness of a juvenile's Miranda waiver and confession. We believe that it would be a better practice for police to routinely have parents present before interrogating a juvenile. At his Rasmussen hearing, D.B.X. stated that he did not ask to have a parent present during his interrogation because "I think that the parents cannot be there."

The adequacy of the warning and nature of the interrogation are also problematic. D.B.X. had been interrogated for a significant length of time before Chambers gave him a Miranda warning.[4] During this pre-Miranda period, Chambers (1) ordered D.B.X. to remove his clothing; (2) told D.B.X. that he would have to "make a recommendation" to the prosecutor about

the case; (3) admonished D.B.X. to tell the truth; (4) challenged D.B.X.'s propensity for truthfulness; (5) told D.B.X. that if he did not "come clean" on small matters, Chambers would not be able to "help"; and (6) encouraged D.B.X. to join, among two kinds of people, the people who "make a mistake" and confess rather than the people who are non-remorseful criminals. By the time that Chambers gave 14–year-old D.B.X. a paraphrased Miranda warning, D.B.X. readily agreed to nearly every statement Chambers made. This coercive technique undermines the voluntariness of D.B.X.'s Miranda waiver.

■ Further, the warning itself was confusing and D.B.X. never clearly waived his Miranda rights. There is no requirement that Miranda warnings "take a rigid form so long as they are correct in substance." *State v. Ouk,* 516 N.W.2d 180, 185 (Minn.1994) (citation omitted). The Minnesota Supreme Court, however, has warned police that "cryptic or paraphrased Miranda warnings may be deemed inadequate by a reviewing court." *Id.* at 185–86 (citation omitted). Although it does not appear on the transcribed copy, the interrogation tape clearly reveals that interspersed in the Miranda warning, Chambers made three references to D.B.X.'s teeth, at one point even saying, "Let me see your teeth." We conclude that the technique used by Chambers in giving the Miranda warning intimidated and confused, rather than enlightened, D.B.X. as to his constitutional rights. Further, Chambers's question to D.B.X., "Do you feel comfortable talking to me?" had no link to the warning and the answer there-

---

he did not ask any questions about them "['c]ause I feel like if I ask, I'm going to feel stupid."

4. Although the district court should have suppressed any statements D.B.X. made during the initial part of the interrogation because

they were made prior to his receiving a Miranda warning, any statements D.B.X. made after the Miranda warning would be admissible if he validly waived his Miranda rights. *See Scott,* 584 N.W.2d at 419.

fore did not validly solicit a waiver of his Miranda rights.

Factually, this case falls somewhere between the cases of juvenile waiver that were egregiously non-voluntary and the cases of valid juvenile waivers. In *In re S.W.T.*, 277 N.W.2d 507, 513 (Minn.1979), the supreme court held that a 12–year–old juvenile's waiver was involuntary where the child was emotionally disturbed and functioned at an 8–year–old level. In other, more typical, juvenile waiver cases, however, the voluntariness of the waiver has been upheld because of the juvenile's age and familiarity with the criminal justice system. *See, e.g., Scott*, 584 N.W.2d at 419 (almost 18–year–old juvenile who was "familiar with the criminal justice system" held to have waived Miranda rights); *Jones*, 566 N.W.2d at 325 (namely 18–year–old juvenile who had been previously adjudicated delinquent on ten prior felony offenses held to have voluntarily waived Miranda rights); *Ouk*, 516 N.W.2d at 185 (15–year–old juvenile who had been given Miranda advisory on three prior occasions held to have voluntarily waived Miranda rights). While no one factor overwhelmingly demonstrates that D.B.X.'s waiver of his Miranda rights was made knowingly, intelligently, and voluntarily, we conclude that based on the totality of the circumstances, including his youth, absence of parents, lack of criminal experience, nature of the interrogation, and inadequacy of the warning, D.B.X. did not knowingly, intelligently, or voluntarily waive his Miranda rights.

## II. Confession

The state must also "show the voluntariness of a confession by a preponderance of the evidence." *Jones*, 566 N.W.2d at 326 (citation omitted).

The test of voluntariness is whether the actions of the police, together with other circumstances surrounding the interro-

gation "were so coercive, so manipulative, so overpowering that [the defendant] was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did." *Id.* (quoting *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991)). In considering the voluntariness of a juvenile confession, the court must also consider the same totality of the circumstances factors that it considers in evaluating the voluntariness of a Miranda waiver. *Id.*

Again, factors weighing in favor of a conclusion that the confession was not voluntary are D.B.X.'s age, his lack of prior criminal experience, the absence of his parents, and the inadequacy of the warnings. The coercive nature of the interrogation after D.B.X. received the Miranda warning also played a part in inducing his confession.

Police may not use deception or stress-inducing interrogation techniques in obtaining a confession. *State v. Garner*, 294 N.W.2d 725, 727 (Minn.1980). If police use deception in an interrogation and it "is the kind that would make an innocent person confess," the confession is involuntary and must be suppressed. *Jones*, 566 N.W.2d at 326; *see In re Welfare of D.S.N.*, 611 N.W.2d 811, 814 (Minn.App. 2000) (police "invite suppression" by making express or implied promises to juveniles during custodial interrogations); *State v. Hough*, 571 N.W.2d 578, 581 (Minn.App.1997) (it is "not professional police tactics to imply to juveniles that 'their best interests' lie in confessing, unless the police sincerely mean it and back up the statement with documentable proof of leniency"), *rev'd on other grounds*, 585 N.W.2d 393 (Minn.1998). Whether police promises have been made and the substance of the promises is to be considered among the factors in determining whether the resulting confession was voluntary.

*State v. Anderson,* 396 N.W.2d 564, 565 (Minn.1986).

■ Here, Chambers used psychological coercion, threats, and express or implied promises to coerce D.B.X. to confess. We specifically deplore Chambers's suggestion to D.B.X. that he would be able to· go home only after he confessed. At his Rasmussen hearing, D.B.X. stated that Chambers kept "putting pressure on me" and that he believed that his only choice was to let Chambers "help" him, that if he confessed Chambers would let him go, and that if he did not confess, he would go to prison. This and other techniques Chambers used during the interrogation have been sharply criticized in other cases. *See, e.g., State v. Slowinski,* 450 N.W.2d 107, 112 (Minn.1990) (police improperly suggested to juvenile defendant that they had influence with county attorney and could arrange for counseling or reduced charge if mitigating circumstances existed); *Garner,* 294 N.W.2d at 727 (interrogating officer, among other things, lied to accused); *State v. Biron,* 266 Minn. 272, 282, 123 N.W.2d 392, 399 (1963) (police made promises that "could only have had the effect of implanting" hope that accused would be treated with leniency); *D.S.N.,* 611 N.W.2d at 815 (police officer suggested county attorney would proceed based on officer's assessment of case and that if the defendant told "truth" he could go home, and contrasted telling truth with having "hard ass attitude" that could result in juvenile getting "ship[ped]" away); *Hough,* 571 N.W.2d at 581 (police implied to juvenile that it was in his best interests to confess); *State v. Critt,* 554 N.W.2d 93, 96 (Minn.App.1996) (police implied that they had stronger evidence against juvenile than they actually had), *review denied* (Minn. Nov. 20, 1996).

Our review of the record leads us to the conclusion that the improper police tactics used in this case were more egregious than in other cases where voluntariness was found because of the variety and repetition of the tactics used in this case. This factor, considered with the other factors of D.B.X.'s youth and inexperience with the law, absence of parents, and inadequacy of the Miranda warning, supports our conclusion that D.B.X.'s will was improperly overborne during the interrogation and that the confession was coerced. *See D.S.N.,* 611 N.W.2d at 814–15 (confession of 17–year–old suppressed where juvenile had little experience with criminal justice system and police promised that if he told "truth" as police saw it, prosecutors would proceed consistent with police assessment of case and juvenile would not be imprisoned and could go home).

## DECISION

We conclude that the district court erred in failing to suppress D.B.X.'s confession because D.B.X. neither knowingly, intelligently, nor voluntarily waived his Miranda rights nor did he voluntarily confess to the crime.

**Reversed.**