**STATE of Minnesota, Respondent,**

v.

**Robert Joseph LIVINGSTON, Appellant.**

No. C4–87–834.

Court of Appeals of Minnesota.

March 1, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Linda K. Jenny, Asst. Co. Atty., Minneapolis, for respondent.

William R. Kennedy, Hennepin Co. Public Defender, John J. Ryan, III, Asst. Public Defender, Minneapolis, for appellant.

Heard, considered and decided by NORTON, P.J., and LOMMEN and IVERSON, JJ.[*]

## OPINION

NORTON, Judge.

This is an appeal from a judgment of conviction of one count of assault in the first degree in violation of Minn.Stat. § 609.221 and three counts of second degree assault under Minn.Stat. § 609.222 after a jury trial.

## FACTS

This case arises out of several attacks by a Pit Bull Terrier. The victims' account of the case is as follows. On the evening of September 8, 1986, Edward Eckblad, Michael Perez and Gary Hamre, three friends, drove together in Eckblad's van to Dougherty's Bar in Minneapolis. Eckblad's black nine-month-old German Shepherd named "Heidi" was also in the van. The three men left the dog in the van and they entered the bar. When they left the bar at about 1:20 a.m., they went back to the parking lot where Eckblad had parked the van. Heidi was still in the van. Eckblad

---

[*] Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

entered his van and sat in it drinking a beer. Hamre and Perez were also in and out of the van. There were approximately five or six cars in the parking lot and eight or so people talking and milling about, some drinking, some not.

Hamre saw appellant open the door to Eckblad's van and hit Heidi, the German Shepherd. Apparently, appellant hit Heidi because she was "barking a little bit." Hamre and Jeff Reynolds, another friend who was socializing in the parking lot, told Eckblad that appellant had hit Heidi. Eckblad got out of his van and told appellant not to hit his dog. He pushed appellant and appellant fell down. Appellant then walked away with his girlfriend.

About five minutes later appellant and his girlfriend returned with a tan Pit Bull Terrier named "Shaker." Appellant had the Pit Bull Terrier on a leash. Eckblad was standing near his van, and his dog was still in the van. Appellant approached the van and ordered the pit bull terrier to attack Heidi. The Pit Bull Terrier jumped at the van, trying to bite the German Shepherd through the van window. Appellant then walked to a nearby car.

At some point, appellant, who was holding on to the Pit Bull Terrier, approached Perez. He shook the Pit Bull Terrier and asked Perez and other bystanders, "You guys want to get bit by this dog?" Appellant was "trying to intimidate" and "scare" them. Meanwhile, two women, including appellant's girlfriend, were pushing and "hassling" Eckblad. Eckblad tried to get back into his van but the women blocked his way.

Appellant, standing twenty feet from Eckblad, still holding the Pit Bull Terrier by the collar, shook the dog and ordered it to attack Eckblad. Appellant specifically ordered the Pit Bull Terrier to "Get 'em." The Pit Bull Terrier obeyed appellant and savagely attacked Eckblad. The dog bit Eckblad on the top of his head, on his face, neck, chest and wrist. Eckblad was on the ground trying to hold the dog down. Appellant did not attempt to get the Pit Bull Terrier off Eckblad, nor did he order the dog off Eckblad. Instead, appellant joined the two women in kicking and hitting Eckblad.

The Pit Bull Terrier did not bite appellant or either of the two women attacking Eckblad but continued to bite only Eckblad. Eckblad yelled to "Mike" Perez for help. Perez ran to Eckblad. Perez saw Eckblad on the ground and saw the Pit Bull Terrier attacking him. He saw appellant and the two women "pushing and pulling" at Eckblad.

Perez tried to pull appellant off Eckblad. Perez heard appellant yelling "Get 'em." The Pit Bull Terrier attacked Perez. It bit him viciously in the cheek and chest. Perez threw the dog off him.

After Perez threw the dog down he thought it "ran straight for Jeff Reynolds." Reynolds said that when he first saw appellant and the Pit Bull Terrier, appellant had the dog on a belt or chain. Reynolds jumped up on a car but was ordered to get off the car by the car's occupant. When he jumped off the car, appellant came at him saying "You want to get bit, you want to get bit." Appellant was "trying to provoke the dog." Then the Pit Bull Terrier was either let loose by appellant or it broke away from appellant. The dog lunged at Reynolds and bit him in the throat, chest, stomach and thumb. When the dog grabbed the lower part of Reynolds' stomach, it clamped its mouth into his stomach and shook it. The dog ripped all the skin off Reynolds' thumb. Reynolds threw the dog off him and kicked the dog. The dog ran off.

Minneapolis police officers Donna Dee and Lori Gregory were the first officers to arrive at the scene. When Officer Dee arrived, she saw the Pit Bull Terrier go "with the crowd that kind of backed off." Immediately before the police arrived, Eckblad's German Shepherd had jumped out the van window, but Hamre held her. Officer Dee saw that the "long-haired German Shepherd stayed by his owner."

In addition to the two dogs, Officer Dee saw five to seven people fighting. When she pulled up everyone "backed off" except one woman who was "punching" Eckblad. That woman was later identified as appel-

lant's girlfriend, Carla Arellano. Arellano is the owner of the Pit Bull Terrier. Officer Dee saw that Eckblad was trying to hold Arellano off.

Officer Dee told Arellano "three to four" times to get off Eckblad. Arellano ignored Officer Dee. Arellano "continued to assault this man." Officer Dee kicked Arellano off Eckblad. Arellano pointed at Officer Dee and said "two words," which Officer Dee could not decipher. Officer Dee thought it was "some sort of command." Officer Dee then saw appellant point at her.

Next, out of her peripheral vision, Officer Dee saw the Pit Bull Terrier "about five feet away from me in the air flying towards me." The dog bit her in the right cheek. She put up her arm to push the Pit Bull Terrier off her and knocked the dog to the ground.

Officer Dee then pulled her gun out and looked around for the Pit Bull Terrier. She saw appellant running towards the alley with the Pit Bull Terrier. Officer Dee gave chase. She found the dog, alone, two blocks away. She shot at the dog twice and missed. Other officers shot the Pit Bull Terrier dead. Appellant turned himself in to the police about a week later.

Eckblad, Perez, Reynolds and Officer Dee were all treated at Hennepin County Medical Center for their injuries. Eckblad required stitches on his face, as did Officer Dee and Perez. One of Perez's lacerations extended across one side of his face and required 26 stitches.

At trial, the state's witnesses' testimony differed on some details. Respondent argues that this is understandable considering it was dark outside when the attack took place and the whole incident took less than four minutes or so; also, the scene was full of "commotion" and chaos with a lot of "screaming and panic."

The defense witnesses' version of the events was different than the victims' account. Appellant said he went to Dougherty's Bar at about 1:00 a.m. that night with two male friends. He said that he was in the bar approximately fifteen or twenty minutes and when he left, "I ran into Arel-

lano walking her dog." The dog was on a leash with a chain hooked around its neck. Appellant said a black German Shepherd came at Arellano and him as they were talking in the alley, whereupon Arellano's dog, the Pit Bull Terrier, tore away from Arellano. Shaker chased Heidi. Then, appellant said, Eckblad, who was intoxicated, ran up to Arellano and said "Grab your dog, Bitch," and slapped her, knocking her to the ground. He said he then jumped on Eckblad in retaliation. Whereupon, he claimed, an unknown assailant slapped him across the knees and head with a pool cue. He said he chased the unknown assailant to the back of the bar, was hit again and fell down behind the bar. He claimed he woke up about two hours later.

The trial court instructed the jury on the element of specific intent for each count of assault. Over appellant's objection the trial court also instructed the jury on the transferred intent doctrine as follows:

When one person intends to inflict bodily harm on another, but instead or in addition thereto inflicts bodily harm on a third person, then the law will consider that the harm inflicted was intended to be inflicted upon the third person.

The court then instructed the jury that as to each assault charged, appellant must have intended to assault each specific victim.

The jury found appellant guilty of assault in the first degree (Perez), assault in the second degree (Perez), assault in the second degree (Eckblad) and assault in the second degree (Reynolds). The jury found appellant not guilty of assault in the second degree in regard to the attack on Officer Dee. Appellant was sentenced to concurrent terms of 21 months (Eckblad), 54 months (first degree assault—Perez), 21 months (Reynolds). No sentence was ordered regarding count 2 (second degree assault—Perez). Thus, Appellant's aggregate sentence equals 54 months.

## ISSUES

I.  Is the evidence sufficient to sustain the verdict?

II. Did the trial court's jury instruction on the doctrine of transferred intent violate due process?

III. Did the trial court err by failing to instruct the jury on the offense of "harm caused by a dog," as a lesser, included offense?

## ANALYSIS

### I.

Appellant argues the evidence is insufficient to support his conviction of three counts of second degree assault for allegedly siccing the pit bull on Eckblad, Perez and Reynolds and one count of first degree assault for causing Perez great bodily harm by siccing the dog on him.

In reviewing a claim that the evidence is insufficient to support a conviction the appellate court must review the record to ascertain whether, under the facts shown and legitimate inferences to be drawn from them, a jury could reasonably conclude that the defendant is guilty of the charged offense. *E.g., State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981). The appeals court must view the evidence in the light most favorable to the prosecution and must assume the jury believed the state's witnesses and disbelieved any contrary evidence. *Id.*

Appellant claims that the state's witnesses testified inconsistently with each other on integral facts and that, assuming the jury believed those witnesses, it is obvious the jury did not presume appellant innocent. Specific contradictions appellant points to follow:

Edward Eckblad, intoxicated at the time of the incident, testified that appellant tried to instigate a dog fight between Eckblad's German Shepherd and a pit bull controlled by appellant (T.21, 22, T.23). Appellant shook the pit bull by the collar and it bit Eckblad. Eckblad and appellant then fought on the ground and the dog bit Eckblad again. He then called for help to Michael Perez (T.24, 25).

Perez testified that he was bitten by the pit bull upon attempting to pull appellant away from Eckblad, but that there was no command by appellant who did not sic the dog on him (T.67, 68).

Jeffrey Reynolds testified that he was bitten by the pit bull after appellant approached with the dog on a chain or belt and said, "Do you want to get bit?" Reynolds did not know if appellant let the dog loose.

Michael Perez, on the other hand, testified that the pit bull ran straight for Reynolds after biting Perez without any intervention by appellant (T.69, 79).

Gary Hamre testified that after the pit bull bit Eckblad, it ran around after anybody it could get at in random fashion (T.55, 56).

Eckblad's testimony that the German Shepherd remained in the van was contradicted by Gary Hamre (T.55), Michael Perez (T.87) as well as the police officers who saw dogs running around, jumping and biting at people (T.152, 128, 212, 213).

Appellant sums up the primary inconsistency:

Eckblad testified that appellant wanted the dogs to fight. Perez testified that the pit bull attacked him and Reynolds without any intervention by appellant.

On the basis of this testimony, appellant argues, the jury could not have found the element of intent for each count, which the trial court told the jury was required, beyond a reasonable doubt. The evidence on intent, appellant claims, is either non-existent or circumstantial.

Regarding the inconsistencies, respondent quotes *State v. Pieschke,* 295 N.W.2d 580, 584 (Minn.1980): "Even inconsistencies in the state's case will not require the reversal of the jury verdict." Respondent argues that the evidence supports a finding of intent on each count.

Additionally, respondent argues that under the transferred intent doctrine the intent to assault Eckblad can be transferred to support the assault counts of Perez and Reynolds, even though the latter two may have been unintended victims. Thus, the state claims it only had to prove that appel-

lant intended to harm someone; the fact that the dog may have actually harmed more than one person does not relieve appellant from criminal liability for each attack after the first one.

■ Based upon our discussion of transferred intent, we hold that respondent is correct in arguing that only the first instance of intent must be supported by the evidence.

## II.

Appellant claims the Due Process Clause of the Fourteenth Amendment was violated when the court instructed the jury on transferred intent. *See* U.S. Const. Amend. 14. The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).

This principle was violated, appellant argues, because the transferred intent doctrine created a presumption of intent which shifted the burden of proof. This has been held unconstitutional in *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed. 2d 344 (1985) (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)). In *Francis* the Supreme Court overturned a murder conviction where jury instructions had the effect of a mandatory presumption on the issue of intent. *Id.* The defendant, a convicted prisoner, was attempting to flee and killed a man in his home when, after demanding the man's car keys, the man slammed his door and the gun fired. *Id.* The trial court's instruction included the statement that:

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted.

*Id.* 471 U.S. at 311, 105 S.Ct. at 1970. The Supreme Court ruled that under *Sandstrom*, the Due Process requirement that every element of a crime be proven beyond a reasonable doubt bars the state from "using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden." *Id.* at 313, 105 S.Ct. at 1970. *Francis* pointed out that:

> This prohibition protects the "fundamental value determination of our society," given voice in Justice Harlan's concurrence in *Winship*, "that it is far worse to convict an innocent man than to let a guilty man go free."

*Id.*

*Francis* outlined a two-step process for evaluating jury instructions to ascertain whether they deprive a defendant of his Due Process rights. *See id.* at 313–14, 105 S.Ct. at 1970–1971. The first step is to determine the nature of the presumption—whether the instruction describes a mandatory presumption or a permissive inference. *Id.* A mandatory presumption instructs the jury that it must infer the presumed fact if the state proves certain predicate facts. *Id.* at 314, 105 S.Ct. at 1971. Mandatory presumptions "violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of an offense." *Id.* (citing *Patterson v. New York*, 432 U.S. 197, 215, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281 (1977)). A permissive inference in an instruction suggests to the jury a possible conclusion to be drawn if the state proves predicate facts, but does not require the jury to draw that conclusion. *Id.* "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* 471 U.S. at 314–15, 105 S.Ct. at 1971 (citing *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979)).

Secondly, if the instruction is found to create a presumption which relieves the state of its burden of persuasion on an element of an offense:

> [T]he potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitution-

al presumption. *Cupp v. Naughten*, 414 U.S. 141, 147, [94 S.Ct. 396, 400, 38 L.Ed. 2d 368] (1973). This analysis "requires careful attention to the words actually spoken to the jury ..., for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." *Sandstrom, supra*, 442 U.S. at 514, 99 S.Ct. at 2454. *Id.* 471 U.S. at 315, 105 S.Ct. at 1971–1972.

*Francis* further ruled that, as to the second step of the analysis, general instructions on the state's burden of persuasion and the presumption of innocence will not necessarily cure a constitutional infirmity created by another instruction. *See id.* at 319–20, 105 S.Ct. at 1974; *See also, Sandstrom*, 442 U.S. at 527, 99 S.Ct. at 2460 ("When a case is submitted to the jury on alternative theories, the unconstitutionality of any of the theories requires that the conviction be set aside.").

Appellant argues the transferred intent instruction here is a mandatory presumption which relieves the state's burden of proving intent: "The state need only prove the predicate facts of bodily harm or attack by the dog to all others after proving intent to assault the first person" and is "relieved of proving the element at intent ... as to others affected." He argues that second degree assault does not require proof of injury and that therefore under the transferred intent instruction, there could be an "endless stream of victims" for which intent to assault need not be proven for appellant to be found guilty. Appellant concludes that "[t]he result here is not 'transferred intent' but presumptive intent."

Appellant cites several state law cases where transferred intent was applied. In *State v. Higgin*, 257 Minn. 46, 99 N.W.2d 902 (1959) the Minnesota Supreme Court ruled that specific intent cannot be presumed and must be established beyond a reasonable doubt. The jury in *Higgin* was told they could presume intent unless the defendant proved otherwise. *Id.* The supreme court reversed, stating that "where specific intent is an essential element of the

offense charged, it can never be presumed, at least in the sense that it must be found from a given state of facts in the absence of countervailing or rebutting evidence." *Id.* at 51, 99 N.W.2d at 907. In *State v. Ott*, 291 Minn. 72, 75, 189 N.W.2d 377, 379 (1971) the court pointed out that the focal point of inquiry in an assault case is the intent of the actor, not the effect on the victim.

Transferred intent does not apply here, appellant claims, because the dog actually bit the intended victim, Eckblad. Intent to assault Eckblad can be used only to establish an assault on Eckblad, appellant claims, and does not relieve the state of its burden to show appellant had intent to assault Perez and Reynolds.

Respondent counters that the trial court correctly included the transferred intent doctrine in the jury instructions. By also instructing the jury on the elements of assault, respondent claims, the court properly instructed the jury that, in order to convict appellant, they must find that appellant "assaulted" each specific victim. The instructions given, respondent argues, are consistent when read together; in effect, the jury was told that in order to find appellant guilty of assaulting a specific victim, he must have assaulted that victim, and the required intent, if found, could be transferred from an intended victim to an unintended victim. Transferred intent applies, respondent claims, even where the intended victim is assaulted in addition to the unintended victim.

The transferred intent doctrine allows the state to prove only that appellant intended to harm someone (Eckblad); the law considers him to have also intended to harm Perez and Reynolds. This conclusion finds support in Minnesota law. For example, in *State v. Jankowitz*, 175 Minn. 409, 221 N.W. 533 (1928), the Minnesota Supreme Court upheld an assault conviction where the defendant shot a woman in the leg but claimed he only intended to shoot her husband. The court stated that the defendant's argument could be construed as stating "Yes, I shot the woman; but you cannot convict me, because I intended to

shoot her husband only." *Id.* at 409, 221 N.W. at 533. General malice to commit harm against another is all that is required, the court stated, without particular malice against the person actually assaulted. *Id.* at 410, 221 N.W. at 533. By operation of law, "the intent ... is transferred from the person intended to the person assaulted." *Id.*

A more recent Minnesota Supreme Court case upheld a defendant's conviction of two counts of first degree murder when one of the victims was killed inadvertently. *State v. Sutherlin*, 396 N.W.2d 238 (Minn.1986). The court held that the defendant could be found guilty of both counts even though one death was not intended because:

> [T]he statute Minn.Stat. § 609.185, incorporates the traditional doctrine of "transferred intent." Specifically, the statute provides that one is guilty of first-degree murder if one "[c]auses the death of a human being with premeditation and with intent to effect the death of the person or of another." *See State v. Gowdy*, 262 Minn. 70, 113 N.W.2d 578 (1962) (making it clear that the defendant need not have premeditated the death of the person who was killed, as long as he premeditated the death of someone.)

*Id.* at 240.

Similarly, the assault statutes involved here appear to authorize the use of the transferred intent doctrine by their terms. The basic assault statute provides:

> "Assault" is:
>
> (1) An act done with intent to cause fear *in another* of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm *upon another*.

Minn.Stat. § 609.02, subd. 10 (1986) (emphasis added).

The conviction was also based on the following statutes:

> Assault in the first degree
>
> Whoever assaults another and inflicts *great bodily harm* may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both.

Minn.Stat. § 609.221 (1986).

> Assault in the second degree
>
> "Whoever assaults another *with a dangerous weapon* may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both."

Minn.Stat. § 609.222 (1986) (emphasis added).

This is a difficult issue. The instruction seems to fit the description of "mandatory," however it was not couched in terms of a "presumption" as in *Francis*. Additionally, the jury was instructed that actual assaults on each individual had to be proven by the state. Furthermore, taking appellant's argument to its logical conclusion, the doctrine of transferred intent is itself unconstitutional because it will always operate to create "mandatory presumption" of intent. This would allow one who threw a bomb into a crowd of people to escape criminal liability for harm to injured persons except one when he can persuade a factfinder that he only intended to harm one particular person. The same would hold true for any dangerous instrumentality which, by its nature, causes harm to more than one person. Under appellant's theory, even defendants in the cases like *Jankowitz* and *Sutherlin* would have to be found not guilty of the deaths of their unintended victims. We conclude that the statutory definition of the intent required for assault is broad enough to account for the trial court's use of the transferred intent doctrine here.

### III.

Appellant also urges reversal on the grounds that the trial court refused to instruct the jury on what appellant deems to be a lesser included crime. The requested offense which the court refused to include in its instructions is "harm caused by a dog" set out in Minn.Stat. § 609.226 (1986):

> *A person who causes great or substantial bodily harm to another by negligently or intentionally permitting any dog to run uncontrolled off the owner's*

*premises, or negligently failing to keep it properly confined is guilty of a petty misdemeanor.* A person who is convicted of a second or subsequent violation of this section involving the same dog is guilty of a gross misdemeanor.

If proven by a preponderance of the evidence, it shall be an affirmative defense to liability under this section that the victim provoked the dog to cause the victim's bodily harm.

(emphasis added.)

The statutory basis for instructing on lesser included offenses is Minn.Stat. § 609.04, subd. 1(4), (5) (1986):

(4) A crime necessarily proved if the crime charged were proved; or

(5) A petty misdemeanor necessarily proved if the misdemeanor charge were proved.

Thus, the question is whether "harm caused by a dog" is necessarily proved where the assault counts are proved. Respondent points out that assault can be, and usually is, proven without the involvement of a dog.

■ Even assuming this is a lesser, included offense, there is a second consideration. A court must instruct a lesser included offense only if there is a rational basis in the evidence for acquitting the defendant of the greater offense and convicting him of the lesser offense. *E.g., State v. Solomon,* 359 N.W.2d 19, 21 (Minn.1984). *See also State v. Ostlund,* 416 N.W.2d 755, 765 (Minn.Ct.App.1987). Respondent argues that the evidence does not support a conviction of "harm caused by a dog." Witnesses testified that the dog was not owned by appellant, and appellant's witnesses testified that Arellano, and not appellant, had control over the Pit Bull. Further, respondent argues, the evidence shows the dog was commanded to attack, and was not uncontrolled.

■ Finally, respondent argues, whether to include a lesser offense, assuming appellant is correct, is within the trial court's discretion. *See Bellcourt v. State,* 390 N.W.2d 269, 273 (Minn.1986). We agree that under the facts of this case the trial court had discretion to determine whether to submit the "harm caused by a dog" offense to the jury.

## DECISION

There is sufficient evidence to support the conviction on all counts. The trial court properly instructed the jury on the doctrine of transferred intent. The trial court did not err by refusing to instruct the jury on the "harm caused by a dog" offense.

Affirmed.