**STATE of Minnesota, Respondent,**

v.

**Jan Michael HOUGH, Appellant.**

**No. C1–96–2595.**

Court of Appeals of Minnesota.

Nov. 25, 1997.

Review Granted Jan. 22, 1998.

Hubert H. Humphrey III, Attorney General, Catherine M. Keane, Assistant Attorney General, St. Paul, for respondent.

Todd Webb, Clay County Attorney, Moorhead, for respondent.

Steven P. Russett, Assistant State Public Defender, St. Paul, for appellant.

Considered and decided by RANDALL, P.J., and LANSING and HARTEN, JJ.

## OPINION

RANDALL, Judge.

This appeal is from a judgment of conviction and sentence for six counts of second-degree assault. Minn.Stat. § 609.222, subd. 1 (1996). The trial court sentenced appellant Jan Hough, who had been certified to stand trial as an adult, to two consecutive executed terms of 72 months each and four stayed sentences of 36 months, to run consecutive to each other and to the prison sentences. We affirm in part, reverse in part, and remand for resentencing.

## FACTS

Appellant Hough was charged with shooting at the house of his high-school principal, Scott Staska, on February 14, 1996. Hough was in a car with three other juveniles. After drinking and partying, the four decided to "shake up the community" by shooting at the high school. They drove by the Barnes-

ville High School, but a janitor was at the school and they drove on to Staska's home, occupied by Staska and his wife, Julie Staska, and their four children. Hough fired seven shots at the house with a .22 rifle. Three of the bullets penetrated the outside wall and entered a bedroom occupied by Staska's two sons, narrowly missing one of the two boys, who were both asleep.

Hough, who was 15 years old at the time of the incident, was certified to stand trial as an adult. He moved to dismiss the complaint, which charged six counts of second-degree assault, for lack of probable cause. He also moved to suppress his statement to police, made the day after the shooting, as not being voluntarily made.

The trial court denied Hough's motions to suppress the confession and to dismiss the complaint. The court found, based on Hough's age, maturity, intelligence, experience with the juvenile court system, and other relevant factors, including the lack of any promises or threats by police, that the confession was voluntary and therefore admissible. The court also found probable cause to support the complaint, including the commission of assaults against the family members other than Scott Staska, based on the doctrine of transferred intent.

Hough waived a jury trial and agreed to a bench trial. At trial, Scott Staska testified that he and his wife had gone to bed when he heard shots and got up and went to his sons' bedroom, where he saw three bullet holes above Timmy Staska's bed. He testified that the boys were asleep. Then, his testimony indicates, his wife took the two boys to their daughters' bedroom, after he called 911. Staska testified that the street outside their house was not well lit and that there was no light on in the house, except possibly a night-light. Staska testified that in the past he had had to discipline two of the boys who were in the car along with Hough, but not Hough himself.

The trial court issued a written order finding Hough guilty of all six counts of second-degree assault. The trial court found that Staska and his wife and four children "were sleeping in their respective bedrooms in the vicinity of where the bullets were fired at the home." The court found that Hough intended to cause Staska fear of immediate bodily harm. The court also concluded that, as to the other counts, the doctrine of transferred intent should apply, even though no one was physically harmed.

The trial court sentenced Hough to 72 months on Count I, a double durational departure, assigning the victim of this count Timmy Staska, the boy whose bed was closest to the bullet holes in the wall. The court imposed a consecutive 72 months on Count II for the assault on the other boy sleeping in the same bedroom. On the remaining four counts, Staska, his wife, and his two daughters, the court sentenced Hough to consecutive 36–month stayed sentences, to be served consecutively to the aggregate 144–month prison sentence. In support of the double departures on Counts I and II, the court cited the particular vulnerability of the young child victims, the invasion of the family's zone of privacy, and the active participation of three or more persons in the crime.

## ISSUES

1. Was appellant's confession voluntary?

2. Is the evidence sufficient, under the doctrine of transferred intent, to support convictions on all six counts?

3. Does the aggregate sentence exaggerate the criminality of appellant's conduct?

## ANALYSIS

### I.

Hough argues that his confession was not voluntarily given and should not have been admitted into evidence. Before the state can introduce a defendant's confession, made during custodial interrogation, it must show that the defendant knowingly, intelligently, and voluntarily waived his right to remain silent. *State v. Ouk*, 516 N.W.2d 180, 184 (Minn.1994). The determination whether a juvenile's waiver of his rights is knowing, intelligent, and voluntary is a fact question dependent on the totality of the circumstances. *State v. Jones*, 566 N.W.2d 317, 324 (Minn.1997). This court does not reverse the trial court's specific findings un-

less clearly erroneous, but does make an independent determination based on the facts as found whether the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. *Id.* The relevant factors in assessing the voluntariness of a juvenile's confession include the child's age, maturity, intelligence, education, experience, and the presence or absence of parents. *Ouk,* 516 N.W.2d at 185.

 Hough argues that his age (15), the police failure to tell him he could be prosecuted in adult court, and the police use of tactics designed to induce him to confess, all weigh against the trial court's conclusion that his confession was voluntary. The failure of police to advise a juvenile of the possibility of adult prosecution does not by itself make a confession unknowing. *State v. Williams,* 535 N.W.2d 277, 287 (Minn.1995). Hough's history in the juvenile court system suggests he would have been aware of the possibility of adult certification, and he specifically asked police at the end of the interview whether he could be charged as an adult. We also note that, although no parent or guardian was present during the interview, police had asked Hough's grandparents, with whom he was living, for permission to talk with him. The presence of a parent or guardian is only one factor to consider and is not a prerequisite to obtaining a valid waiver from a juvenile.

Police in this case did suggest that it was in Hough's "best interest" to admit involvement and implied that the interview would be his only chance to tell his side of the story. But they made no promises or misrepresentations. The fact that police used a "sympathetic" approach, allowing Hough to minimize his conduct and encouraging him to see that his "best interest" lay in confessing, does not render the confession involuntary. *See State v. Pilcher,* 472 N.W.2d 327, 333 (Minn.1991) (holding that use of "sympathetic" approach does not, in itself, render statements involuntary). We note that it is not professional police tactics to imply to juveniles that "their best interests" lie in confessing, unless the police sincerely mean it and back up the statement with documentable proof of leniency. Otherwise, the statement is a deception.

But on these facts, we conclude that the state did establish, by a preponderance of the evidence, that Hough's confession was voluntarily made. *See Jones,* 566 N.W.2d at 326 (stating prosecution's burden of proof).

## II.

Hough argues that the trial court erred in applying the doctrine of transferred intent. We agree. Hough argues that there was insufficient evidence to support his conviction of the assaults other than the assault against Scott Staska himself, but in his brief and at oral argument concedes that since Staska's wife was awake and was put in fear, as to her, the state does have a case for assault by transferred intent. We agree again and, as to the convictions against Scott Staska and his wife, we affirm.

 But moving on to the other four counts of second-degree assault, those involving Staska's four children, we reverse. Second-degree assault requires that the defendant commit an act with a dangerous weapon with intent to cause fear in another of immediate bodily harm. Minn.Stat. §§ 609.02, subd. 10(1), 609.222, subd. 1 (1996). Actual bodily harm is not required for this type of assault, and the effect on the victim is not determinative of the defendant's intent to cause fear. *State v. Soine,* 348 N.W.2d 824, 826 (Minn.App.1984), *review denied* (Minn. Sept. 12, 1984). The harm punished by this part of the assault statute is the potential infliction of the psychological harm of apprehension of immediate bodily harm or death.

 The classic application of the transferred intent doctrine occurs when a person, other than the defendant's intended victim, suffers the actual harm intended for, but not inflicted on, the intended victim. 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law,* § 3.12(d), at 400 (West 1986). LaFave and Scott refer to this as the "bad aim" problem. *Id.* at 399. It has two characteristics: (1) the intended victim escapes the harm intended; and (2) the unintended victim suffers harm. The doctrine of transferred intent has been applied (logically) in Minnesota when the intended victim also actually suffered the intended harm. *See State*

v. *Merrill,* 450 N.W.2d 318, 323 (Minn.1990) (transferred intent applied to support conviction for first- and second-degree murder committed against an unborn child where unintended unborn child victim suffered substantially similar harm as mother, the intended victim); *State v. Livingston,* 420 N.W.2d 223, 229-30 (Minn.App.1988) (transferred intent applied to support assault convictions where intended and unintended victims were assaulted by defendant's dog).

Classic examples of transferred intent include the following: The defendant shoots at "A", and the bullet goes through "A" and injures "B", or misses "A" and injures "B". Either scenario could support a criminal conviction by proof beyond a reasonable doubt for a crime against "B". If a defendant shoots at "A" intending only to scare "A", but in so shooting also scares "B", that evidence will support a criminal conviction for an assault crime against "B". But if a defendant shoots at "A", whether "A" is injured physically and/or emotionally, or not at all, the mere fact of a shot at "A" will not support convictions against other people sleeping in the vicinity if, as to those other people, the defendant was unaware that they were there, did not intend them any harm, did not cause them any physical harm (no injury by a stray bullet, for instance), did not cause them any fear or emotional harm (because they slept through the act), and were totally unaware of the shot(s) until after the assault against "A" had been completed.

In *Merrill,* the defendant was indicted for first- and second-degree murder committed against an unborn child, as well as against the child's mother. 450 N.W.2d at 320. The supreme court held that the doctrine of transferred intent did apply because the intended victim and the unborn child suffered substantially similar harms. *Id.* at 323. On our facts, the four children did not *suffer* any *similar harm* as their parents because they were not placed in fear at the time the shots were fired, as their parents were. In *Livingston,* this court affirmed convictions of second-degree assault, for an assault against the intended victim, who was bitten by defendant's dog, and first- and second-degree assault, for assaults against the other two vic-

tims, who were *also attacked* by the dog. 420 N.W.2d at 229-30.

The state presented evidence that Hough shot at the Staska house with intent to cause apprehension in Scott Staska. The trial court specifically found intent to cause apprehension as to Scott Staska only.

16. Based upon the evidence, the Court finds that by his act of shooting seven bullets into the home of Scott Staska, the Defendant intended to cause Mr. Staska fear of immediate bodily harm or death. Accordingly, the Court further finds, beyond a reasonable doubt, that Defendant assaulted Scott Staska with a dangerous weapon on the evening of February 14, 1996. Consequently, the required elements necessary to convict Defendant of Assault in the Second Degree have been met.

The state presented virtually no evidence from which to infer that Hough knew there would be others in the house. The decision to shoot at the Staska house was a last-minute decision, after the juveniles were foiled in their plan to shoot at the high school. Hough had attended Barnesville High School for only a couple of weeks and had little opportunity to acquire any knowledge about Principal Scott Staska and his family. There was testimony that Hough had been in the Staska house as a child before Staska bought it. But this evidence tended to show only that Hough may have remembered the layout of the house, not that he knew the number of current occupants.

We agree with the state's argument that, even without evidence that Hough knew Staska was married or shared occupancy of the house, Hough can be convicted under the doctrine of transferred intent with an assault on Julie Staska. She suffered the same apprehension of immediate bodily harm or death that Scott Staska did. The fact that the intended victim (Staska) also suffered harm is not a bar to application of the doctrine of transferred intent. *See State v. Ford,* 539 N.W.2d 214, 229 (Minn.1995) (affirming attempted-murder conviction for bystander struck by bullet intended for murdered police officer); *Merrill,* 450 N.W.2d at 323 (applying doctrine of transferred intent

to unborn child victim of mother's death); *Livingston,* 420 N.W.2d at 229–30 (rejecting argument that transferred intent does not apply if intended victim is injured). We see no logic in the suggestion in the concurrence and dissenting opinion that Merrill and Livingston, although plainly involving situations in which the intended victim did suffer harm, should somehow be limited to the "classic" transferred intent in which the intended victim is not injured. Hough may not have specifically intended physical or emotional harm to Julie Staska. The trial court made a specific finding of intent to harm only as to Scott Staska. But Julie Staska was in the same vicinity as her husband and actually suffered emotional harm as Hough intended for her husband. The conviction for assault as to Julie Staska, from the standpoint of Minnesota's caselaw and that of other states, is solid. Contrary to the dissent, nothing more can be said.

The other four assault counts, for offenses against the four Staska children, present a different issue. The evidence indicates the four children were asleep at the time of the shooting, suffered no physical harm (e.g., not struck by any stray bullet or flying debris), suffered no apprehension of immediate bodily harm or death, and knew nothing of the shooting incident until after it was over.

There is no Minnesota case law holding that an intent to harm one victim may be transferred to other "victims" of whom the defendant is unaware, of whom the defendant intends no harm, and who do not suffer any harm, either physical or emotional. The state cites two cases affirming multiple counts of assault for attacks upon occupied houses. *See State v. Abeyta,* 328 N.W.2d 443, 445 (Minn.1983); *State v. Rieck,* 286 N.W.2d 724, 725 (Minn.1979). Neither opinion can be stretched to this set of facts to affirm convictions, other than Mrs. Staska, on the doctrine of transferred intent, and neither opinion even mentioned transferred intent. In *Abeyta,* the defendant, who shot at a house occupied by a couple, was appar-

ently aware both people were present, but claimed he intended only to "startle" them. 328 N.W.2d at 444. His defense was that intending to startle was not what the assault statute had in mind. The supreme court basically found that intending to "startle" by firing a gun at a house, knowing two people are there, is enough evidence to sustain a conviction on the essential element of intending to cause fear. *Id.* at 445 (finding no merit to contention that state failed to establish defendant intended by act of shooting gun at house to put residence in fear of immediate bodily harm or death). In *Rieck,* the supreme court did not discuss the intent of the defendant, who was convicted of five counts of aggravated assault for firebombing a house occupied by a couple and three of their four children. 286 N.W.2d at 725.

We conclude that the doctrine of transferred intent cannot be stretched to apply to unintended victims who do not suffer the harm proscribed by the statute and who are unaware of the event until it is over.

If a person's aim is bad, and he *actually* harms an unintended victim, "the law considers him (as it ought) just as guilty as if he had actually harmed the intended victim." LaFave, § 3.12(d) at 400. In that case, the offender's mental state and the harm he inflicts both fit within the criminal prohibition. The seminal fact is actual harm to an unintended victim when harm was intended to another. Here there was no harm, either physical or emotional, to the sleeping children. Hough neither had the proscribed intent with respect to the four Staska children nor caused the proscribed harm. To stretch the doctrine of transferred intent in this situation would be to take a criminal statute beyond common sense and impose criminal liability merely because someone might argue that Hough should not benefit from the fortuitous circumstance that his bullets missed the four children and that they were sleeping.[1] The law is clear that penal statutes must be strictly construed against the

---

1. Appellant concedes that statutes other than second-degree assault as to the four children could have been applied. The state could have charged Hough with reckless discharge of a firearm, a felony, or drive-by shooting, a felony with the

same severity level as second-degree assault. *See* Minn.Stat. § 609.66, subds. 1a(2) (felony reckless discharge of a firearm), 1e(a) (drive-by shooting) (1996); *see also* Minn. Sent. Guidelines V (Offense Severity Reference Table).

state. *E.g., State v. Wagner,* 555 N.W.2d 752, 754 (Minn.App.1996). The law does not assign additional criminal convictions to Hough simply because good fortune prevented the four children from being harmed physically or by being placed in fear of bodily harm or death. The concurring and dissenting opinion's reliance on the Maryland Court of Appeals' theory of "concurrent intent" in *Ford v. State,* 330 Md. 682, 625 A.2d 984, 1000 (1993) assumes an awareness by the defendant of the presence of secondary victims. That is not our facts.

## II.

Hough argues that the aggregate sentence, of 144 months in prison followed by 144 months on probation, exaggerates the criminality of his conduct. Hough does not contest the presence of some aggravating circumstances. He asks, as he did at sentencing, that an aggregate sentence of 108 months be imposed instead because the 144–month sentence imposed unfairly exaggerates the criminality of the offense. *See generally State v. Norris,* 428 N.W.2d 61, 71 (Minn.1988) (modifying consecutive sentences that, although technically permissible, exaggerated criminality of defendant's conduct). *Norris* is a strong case in point because in *Norris* there were five different bona fide victims of assault with a deadly weapon. All were awake at the time, all had a gun pointed in their direction, and all were placed in fear or apprehension of harm or death. Even with five solid separate convictions against different victims in place, the Minnesota Supreme Court, while upholding the convictions on the issue of sufficiency of the evidence, and restricted the trial court to no more than three consecutive sentences for the five victims. *Id.* at 71.

However, because we reverse four of the six assault convictions and remand for resentencing, we do not address Hough's sentencing arguments in detail. Hough concedes that a reversal of some of the assault counts in his favor requires a remand for resentencing on Mr. and Mrs. Staska. The two counts

on which the trial court executed Hough's sentence, and on which it departed, were counts for which the Staska children were the victims. It is unfortunate that the trial court did not execute Hough's sentence on the two strongest counts, Mr. and Mrs. Staska, when the trial court itself in finding number 16 concluded that Hough intended harm to Mr. Staska. Because we are reversing convictions on which the sentences were executed and affirming only the convictions for which the trial court imposed concurrent stayed sentences (because concurrent as to convictions that we vacate today, the concurrent stayed sentences as to the counts involving Mr. and Mrs. Staska are vacated by definition), both attorneys readily agree that a remand for resentencing on the counts involving Mr. and Mrs. Staska is appropriate.[2] At that time, appropriate grounds for departure, if any, can be considered. We note that on remand Hough may not be given a total sentence greater than that originally imposed. *See State v. Coe,* 411 N.W.2d 180, 182 (Minn.1987).

## DECISION

Appellant's confession was voluntary and properly admitted into evidence. The doctrine of transferred intent may be used to prove an assault on Julie Staska, but not assaults on the four Staska children. As to the four Staska children, the assault convictions are dismissed. Appellant's sentence must be remanded for resentencing.

**Affirmed in part, reversed in part, and remanded.**

HARTEN, Judge (concurring in part and dissenting in part).

I concur with the court's conclusion that appellant's confession was admissible as voluntarily made and that part of the opinion holding inapplicable the doctrine of transferred intent. Because I believe that appellant's five convictions for assaulting Scott Staska's wife, Julie Staska, and each of the

---

**2.** Contrary to the dissent's inference, we are not letting stand stayed sentences which the trial court ran concurrent to counts that we vacate today. We do affirm the convictions on those

two counts. But we are expressly remanding and giving the trial court the freedom to resentence appellant on the two counts of assault involving Mr. and Mrs. Staska.

four Staska children should stand independent of transferred intent [3] and that the sentences pronounced by the district court are lawful, I respectfully dissent from the court's reversal of appellant's convictions for assaulting the Staska children. As to the court's affirmance of appellant's conviction for assaulting Julie Staska, I concur in the result.

Appellant was charged with six counts of second-degree assault pursuant to Minn.Stat. § 602.222, subd. 1 (1996). That statute forbids the assault of another with a dangerous weapon. In material part, the law defines assault as follows:

Minn.Stat. § 609.02 DEFINITIONS.

Subd. 10. Assault. "Assault" is

(1) An act done with intent to cause fear in another of immediate bodily harm or death;

(2) * * *.

Under subdivision 1 of section 609.222, the state must show that appellant had such intent, which the factfinder may infer. *See State v. Soine*, 348 N.W.2d 824, 826 (Minn. App.1984) (the state need only introduce evidence from which it may be inferred that the accused had the requisite intent). Here the crimes were complete upon the discharge of the firearm. The split-second merger of the act (firing the rifle) and intent (to cause fear in another of immediate bodily harm or death) completes the crime. One need not look further to the consequences of the firing or the actual effect on the other person or persons who were the primary or secondary victims except insofar as the effect upon others may shed light upon the intent of the actor. *See State v. Ott*, 291 Minn. 72, 75, 189 N.W.2d 377, 379 (1971) (intent of actor, not effect on victim, is focal point, but ordinary effect on others "may naturally be taken into account to determine intent"). Thus in *State v. Abeyta*, 328 N.W.2d 443, 444 (Minn.1983), the appellant fired a 12–gauge shotgun in the middle of the night at a couple's house and later claimed that he did so only to startle, not frighten, the couple within. The su-

preme court saw no merit in appellant's contention that "the state failed to establish that he intended by his act of shooting the gun at the house to put the residents in fear of immediate bodily harm or death." *Id.* at 445.

In the instant case, the following were among the findings of fact made by the district court:

4. * * * [Appellant] obtained a .22 caliber, semi-automatic rifle * * *.

* * * *

6. [Appellant] and the others subsequently agreed to shoot at the home of the high school principal, Mr. Scott Staska.

* * * *

8. [Appellant] proceeded to * * * pick up the rifle, aim it at the left side of the Staska home, and discharge the rifle at the Staska home in a rapid-fire manner, expending seven shots. * * * Nathan Bontjes then quickly drove the vehicle away from the Staska home.

9. The bullet holes were located between two bedrooms on the left side of the home. Three of the bullets went through the outside wall and lodged in the interior of the home, narrowly missing one of the four Staska children.

10. At the time of the shooting, Scott Staska and his wife, Julie Staska, and their four children were sleeping in their respective bedrooms in the vicinity of where the bullets were fired at the home.

* * * *

15. * * * [Appellant's] confession to law enforcement authorities provides that he was going to "just shoot somebody or something." * * * [T]he group *decided to shoot at the home of the principal of the high school, Scott Staska.* [Appellant] and the others drove to the Staska home in a deliberate manner. [Appellant] decided not to shoot at the large picture window, which generally would be where the living room is located, and, instead *decided to shoot at the left side of the house, which*

---

**3.** For a discussion of the development and parameters of the transferred intent doctrine, see Judge Moylan's opinion in *Harvey v. State*, 111 Md.App. 401, 681 A.2d 628 (1996), and the Maryland Court of Appeals decision in *Ford v. State*, 330 Md. 682, 625 A.2d 984 (1993). Minnesota caselaw lacks a comprehensive clarification of the doctrine. Our opinion in *State v. Livingston*, 420 N.W.2d 223 (Minn.App.1988), on which the district court relied, is not helpful.

might logically be the location of other rooms, including bedrooms in which the family would be sleeping at that time of night [about 10:45 p.m.].

16. * * * [B]y his act of shooting seven bullets into the home of Scott Staska, [appellant] intended to cause Mr. Staska fear of immediate bodily harm or death.

* * * *

19. [Appellant] fired seven bullets into the Staska home when the possibility existed that the home contained family members other than Scott Staska [the primary victim]. *It was also a highly probable consequence that others in the home would be victims of* [appellant's] *actions.* * * * In this case, physical injury is not an element of the crime of Assault in the Second Degree. Accordingly, no physical injury is necessary for intent to transfer to the other five family members. Thus, [appellant's] *intent to assault Scott Staska with a dangerous weapon transfers to the other five family members of the Staska family.*

(Emphasis added). It is apparent that the district court, albeit attempting to apply the law of transferred intent, found facts sufficient to support application of the law of *concurrent intent,* that is, intent to contemporaneously cause fear not only in the primary victim, but also in secondary victims present in the zone of harm (here the Staska home) when appellant rapidly fired seven shots into the home. The difference between transferred intent and concurrent intent is set forth by the Maryland Court of Appeals in *Ford,* 625 A.2d at 1000–01:

In transferred intent, the intended harm does not occur to the intended victim, but occurs instead to a second unintended victim. The actual result is an unintended, unanticipated consequence of intended harm. * * * The intent is concurrent, on the other hand, when the *nature and scope of the attack,* while directed at a primary victim, are such that we can conclude the perpetrator intended to insure harm to the primary victim by harming everyone in

that victim's vicinity. * * * *Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.*[4]

(Emphasis added). The harm in the instant case, of course, is physical presence in the zone of harm when appellant undertook his senseless firing. It is irrelevant to a finding of the commission of second-degree assault that the four Staska children were sleeping when appellant fired into the home. One cannot deny that the children were in the zone of harm; bullets pierced the wall inches over the head of one of the sleeping Staska boys. Appellant sprayed seven bullets from a semi-automatic rifle gangland style into Staska's home, allegedly not to harm anyone, but only to "scare" Scott Staska. Never mind that Staska's spouse and four children were in the same vicinity of the house—and that appellant had never met Scott Staska, but only knew of him as the high school principal. Unpersuaded, and relying on the opinion of this court in *Livingston,* the district court found appellant guilty of assaulting Staska himself, and under the transferred intent doctrine, of assaulting Staska's family. The district court did not need the transferred intent doctrine. Given the nature and scope of this attack, if Scott Staska was the primary victim, the presence of his wife and children who were with him in the zone of harm supports an inference that they were secondary victims. There being criminal intent as to Staska, it was concurrent criminal intent affecting all of those who shared with him the zone of harm. That was the sense of the district court's findings of fact and that is the sense in which we should review the district court's application of law to the facts it found.

Given my position in dissent, I have no quarrel with court's result in upholding appellant's conviction with regard to Julie Staska. The means the court uses to effect that result, however, exacerbates the confused

**4.** The analysis applied in *Ford* assumes the perpetrator's awareness of the presence of secondary victims. The rule stated, however, accommodates the factfinder's inference of intent to harm those in the zone of harm, which is precisely what the district court attempted to do here through application of the transferred intent doctrine.

state of Minnesota law on transferred intent. The court first defines "classic" transferred intent as occurring "when a person, other than the defendant's intended victim, suffers the actual harm intended for, *but not inflicted on, the intended victim.*" (Emphasis added). That definition is solid. But then citing *Merrill* and *Livingston,* the court defeats the "classic" definition by using a hybrid transferred intent that applies also "when the intended victim also actually suffered the intended harm." In my opinion, the court's extended application is just plain wrong. I know of no accepted definition of transferred intent other than the "classic" definition. Thus, while reversing the trial court for "stretching" transferred intent to cover the Staska children, the court itself stretches the doctrine to cover Julie Staska.

Finally, citing agreement of counsel, the court pays little heed to obvious resentencing problems occasioned by its reversal of the convictions for assaulting the four Staska children. Appellant was charged with committing six counts of assault, one count per victim. Appellant's two consecutive executed prison sentences were imposed for the his assaults upon the two Staska boys. The assaults of parents Scott and Julie Staska and the two Staska girls each resulted in stays of execution of sentence. The court has reversed the convictions involving the assaults of all four of the children, boys and girls, thereby automatically voiding the executed sentences for the assaults of the boys.

Nonetheless, the court remands for "open sentencing" on the affirmed convictions for the assaults of Scott and Julie Staska. Yet appellant has already been sentenced for the latter assaults, receiving stays of execution on both, which sentences still stand, but depending upon what the court means by "open sentencing," apparently are now subject to modification on remand. The court cites no authority for this beyond agreement of counsel.